UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

| | |
|---|---|
| LEHMAN BROTHERS HOLDINGS INC., ) <br> ) <br> Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> 1st NEW ENGLAND MORTGAGE ) <br> CORPORATION dba ABERDEEN ) <br> MORTGAGE and FNE MORTGAGE, ) <br> ) <br> Defendant. ) | Civil Action No. 09-cv-11082-GAO |

**PLAINTIFF LEHMAN BROTHERS HOLDINGS INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON LIABILITY AND LOCAL RULE 7.1(D) REQUEST FOR HEARING**

Plaintiff Lehman Brothers Holdings Inc. ("LBHI" or "Plaintiff") respectfully submits this Memorandum of Law in Support of its Motion for Summary Judgment on Liability and Local Rule 7.1(D) Request for Hearing pursuant to Rule 56 of the Federal Rules of Civil Procedure. There are no genuine issues of material fact and LBHI is entitled to judgment as a matter of law on its cause of action for breach of contract against Defendant 1st New England Mortgage Corporation dba Aberdeen Mortgage and FNE Mortgage ("1st New England" or "Defendant"). At this time, LBHI only seeks summary judgment on 1st New England's liability for breach of contract and attorney fees, but reserves the right to move for summary judgment on the amount of damages LBHI has sustained and the amount of attorney fees LBHI has incurred at a later date.

I.     FACTUAL BACKGROUND

LBHI has commenced a voluntary case under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"), and is authorized to operate its business and manage its property as a debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. As

such, LBHI is prosecuting this case to preserve the value of its assets for the benefit of its creditors.

This is a straightforward case involving an unambiguous loan purchase agreement under which 1st New England sold mortgage loans to LBHI's assignor, Lehman Brothers Bank, FSB ("LBB"). LBB purchased the mortgage loans subject to certain representations, warranties, and covenants in Aurora Loan Services, LLC's ("Aurora") incorporated Seller's Guide (the "Seller's Guide") that 1st New England made regarding the quality of the loans. 1st New England further represented that if its representations regarding a loan were wrong, it would repurchase that loan or indemnify LBB for its losses on such loan.

1st New England breached the loan purchase agreement and Seller's Guide with respect to the Bloat Loans, defined *infra*, by submitting loan documents to LBB that contained misrepresentations and untrue statements of fact related to the gross monthly income of the Bloats, defined *infra*. Therefore, 1st New England had an obligation to repurchase the Bloat Loans or indemnify LBHI against any losses arising out of the Bloat Loans because of the misrepresentations and untrue statements of fact related to the Bloats' gross monthly income. To date, however, 1st New England has not repurchased the Bloat Loans or indemnified LBHI for the losses sustained on the Bloat Loans, which is also a breach of the loan purchase agreement and Seller's Guide.

**A. THE AGREEMENT, SELLER'S GUIDE, AND BLOAT LOANS**

On or about September 2, 2004, 1st New England entered into a written loan purchase agreement with LBB (the "Agreement"). (*See* Declaration of John Baker ("Baker Decl.") at ¶ 2, its Exhibit A, Agreement.) The Agreement specifically incorporates the terms and conditions of the Seller's Guide, which sets forth additional duties and obligations of 1st New England. (*See* Baker Decl. at ¶ 3, its Ex. B, Seller's Guide.)

Aurora is the authorized agent, servicer, and/or master servicer for LBB and LBHI for certain mortgage loans in which LBB and LBHI have an interest, including the Bloat Loans. (*See* Baker Decl. at ¶ 3.) Aurora is authorized and directed by LBB and LBHI to enforce any obligations owed to them by parties selling mortgage loans in which LBB and/or LBHI have an interest. (*Id.*)

1st New England originated and sold various loans to LBB pursuant to the Agreement and Seller's Guide, including Loan No. ****8820 (the "Bloat First Loan") and Loan No. ****9018 (the "Bloat Second Loan") that Roger and Neira Bloat (the "Bloats") obtained to purchase a residence located at 598 Peppergrass Run, Royal Palm Beach, Florida. (*See* Baker Decl. at ¶ 4, its Ex. C, Purchase Advices.) (The Bloat First and Second Loan are collectively referred to herein as the "Bloat Loans"). The Bloat Loans were sold to LBB as stated income loan products. (*See* Baker Decl. at ¶ 4.)

After purchasing the Bloat Loans from 1st New England, LBB assigned them to LBHI. (*See* Baker Decl. at ¶ 5, its Ex. D, Note for the Bloat First Loan ("Bloat First Note") and Note for the Bloat Second Loan ("Bloat Second Note"); *see also* Baker Decl. at ¶ 5, its Ex. E, Whole Loan Tracking.) Thereafter, LBB assigned all of its rights under Agreement and Seller's Guide related to the Bloat Loans to LBHI, including all rights in and to any and all representations, warranties, and covenants 1st New England made to LBB in the Agreement and Seller's Guide with regard to the Bloat Loans and all rights to the repurchase and indemnity remedies relating to the Bloat Loans, among other things. (*See* Baker Decl. at ¶ 5, its Ex. F, Assignment.)

1.   **1st New England's Representations, Warranties, and Covenants**

   (i)   *Sections 701 Representations, Warranties and Covenants of Seller and 703(1) Mortgage Loans as Described*

1st New England acknowledged in Section 701 of the Seller's Guide that LBB purchased the Bloat Loans subject to and in reliance upon the various representations, warranties, and

3

covenants that 1st New England made to LBB in the Agreement and Seller's Guide regarding the quality of the Bloat Loans. (*See* Baker Decl., its Ex. B, Seller's Guide § 701.) In Section 703(1), 1st New England made representations, warranties, and covenants regarding the truth and accuracy of the documents it submitted to LBB in the Bloat Loans file or related to the Bloat Loans, including, but not limited to, the applications for the Bloat Loans:

> **No document, report or material furnished to Purchaser in any Mortgage Loan File or related to any Mortgage Loan** (including, without limitation, **the Mortgager's application for the Mortgage Loan** executed by the Mortgagor), **was falsified or contains any untrue statement of fact** or omits to state a fact necessary to make the statements contained therein not misleading.

(*See* Baker Decl., its Ex. B, Seller's Guide § 703(1) (emphasis added).)

    *(ii)    Section 703(12) Validity of Mortgage Documents*

Similarly, in Section 703(12), 1st New England made representations, warranties, and covenants regarding the validity of the mortgage documents and the accuracy of the representations in the loan documents associated with the Bloat Loans:

> **The documents, instruments and agreements submitted for loan underwriting were not falsified and contain no untrue statement of material fact** . . . . No fraud was committed in connection with the origination of the Mortgage Loan.

(*See* Baker Decl., its Ex. B, Seller's Guide § 703(12) (emphasis added).)

    **2.    1st New England's Repurchase and Indemnity Obligations**

    *(iii)    Section 710 Repurchase Obligation*

Pursuant to Section 710, 1st New England agreed to repurchase loans that contained breaches of the various representations, warranties, or covenants of the Seller's Guide, or otherwise indemnify LBHI for losses sustained on such loans in accordance with Section 711 either within thirty (30) days of a demand or 1st New England's knowledge of such breach:

> In the event of a **breach of any of the representations, warranties or covenants** contained in Section 700 through 710 herein . . . **Seller shall, at Purchaser's option, repurchase the related Mortgage Loan . . . at the Repurchase Price**.

> **Any such repurchase shall occur no later than thirty (30) days after the earlier of the date on which Purchaser notifies Seller of such breach or the date on which Seller knows of such breach.**
>
> \* \* \*
>
> . . . **with respect to each Mortgage Loan that is the subject of any breach of one or more representations, warranties or covenants** specified in *Section 702 or 703* hereof, if Purchaser . . . has acquired title to the related Mortgaged Property through foreclosure . . . then, **within thirty (30) days after Purchaser's demand therefor, Seller shall, at Purchaser's option: (i) purchase the Mortgaged Property from Purchaser at a purchase price equal to the Repurchase Price; or (ii) if Purchaser has sold or otherwise disposed of the Mortgaged Property, indemnify Purchaser as specified in *Section 711* hereof.**

(*See* Baker Decl., its Ex. B, Seller's Guide § 710 (emphasis added).)

   *(iv)*  Section 711 Indemnification and Third Party Claims

Section 711 requires 1st New England to indemnify LBHI from all damages related to or resulting from any act or failure to act or any breach of any of the representations, warranties, or covenants it made to LBB with respect to the Bloat Loans:

> . . . **Seller shall indemnify Purchaser** . . . **from and hold them harmless against all claims, losses, damages**, penalties, fines, claims, forfeitures, lawsuits, court costs, reasonable attorney's fees, judgments and any other costs, fees and expenses that the Purchaser may sustain **in any way related to or resulting from any act or failure to act or any breach of any warranty, obligation, representation or covenant contained in or made pursuant to this Seller's Guide or the Loan Purchase Agreement** by any agent, employee, representative or officer of Seller or Seller's correspondent.

(*See* Baker Decl., its Ex. B, Seller's Guide § 711 (emphasis added).)

**B. THE BLOATS MISREPRESENTED THEIR INCOME IN THE BLOAT APPLICATIONS**

When 1st New England sold the Bloat Loans to LBB, it submitted a loan package that included various documents, including, but not limited to, the application for the Bloat First Loan dated January 4, 2006 (the "Bloat First Application") and the application for the Bloat Second Loan dated April 19, 2006 (the "Bloat Second Application") (collectively, the "Bloat Applications"). (*See* Baker Decl. at ¶ 7, its Ex. G, Bloat Applications.) In the Bloat

Applications, the Bloats represented that their combined gross monthly income as of January 4, 2006 and April 19, 2006 was $14,400, which is shown in the below excerpts from the Bloat Applications:

| V. MONTHLY INCOME AND COMBINED HOUSING EXPENSE INFORMATION | | | | | | |
|---|---|---|---|---|---|---|
| Gross Monthly Income | Borrower | Co-Borrower | Total | Combined Monthly Housing Expense | Present | Proposed |
| Base Empl. Income | $ | $ 5200.00 | $ 5200.00 | Rent | $ 1180.00 | |
| Overtime | | | | First Mortgage (P&I) | | $ |
| Bonuses | | | | Other Financing (P&I) | | 962.85 |
| Commissions | | | | Hazard Insurance | | 183.33 |
| Dividends/Interest | | | | Real Estate Taxes | | 625.00 |
| Net Rental Income | | | | Mortgage Insurance | | |
| Other (before completing see the notice in "describe other income," below) | 4500.00 2800.00 | 1900.00 | 6400.00 2800.00 | Homeowner Assn. Dues Other: | | |
| Total | $ 7300.00 | $ 7100.00 | $ 14400.00 | Total | $ 1180.00 | $ 1771.18 |

| B/C | Describe Other Income | Monthly Amount |
|---|---|---|
| B | Pension | $ 4500.00 |
| C | Child Support | 1900.00 |
| B | Verible supplement fund | 916.67 |

| V. MONTHLY INCOME AND COMBINED HOUSING EXPENSE INFORMATION | | | | | | |
|---|---|---|---|---|---|---|
| Gross Monthly Income | Borrower | Co-Borrower | Total | Combined Monthly Housing Expense | Present | Proposed |
| Base Empl. Income | $ | $ 5200.00 | $ 5200.00 | Rent | $ 1180.00 | $ |
| Overtime | | | | First Mortgage (P&I) | | 2500.35 |
| Bonuses | | | | Other Financing (P&I) | | 1055.87 |
| Commissions | | | | Hazard Insurance | | 136.92 |
| Dividends/Interest | | | | Real Estate Taxes | | 84.95 |
| Net Rental Income | | | | Mortgage Insurance | | |
| Other (before completing see the notice in "describe other income," below) | 4500.00 2800.00 | 1900.00 | 6400.00 2800.00 | Homeowner Assn. Dues Other: | | |
| Total | $ 7300.00 | $ 7100.00 | $ 14400.00 | Total | $ 1180.00 | $ 3778.09 |

| B/C | Describe Other Income | Monthly Amount |
|---|---|---|
| B | Pension | $ 4500.00 |
| C | Child Support | 1900.00 |
| B | Verible supplement fund | 916.67 |

(*See* Baker Decl., its Ex. G, Bloat Applications at Section V.)

Specifically, the Bloats represented that Mr. Bloat's total gross monthly income was $7,300 and Mrs. Bloat's total gross monthly income was $7,100, as of the dates of the Bloat Applications. (*Id.*) The Bloats further represented that of the $7,300 that Mr. Bloat listed as his total gross monthly income, $4,500 of that amount was purportedly from a pension plan and $2,800 of that amount was from other income, $916.67 of which was attributed to a variable supplement fund. (*Id.*) The Bloats additionally represented that of the $7,100 that Mrs. Bloat listed as her total gross monthly income, $5,200 of that amount was purportedly from gross

6

monthly base employment income and $1,900 was from monthly child support payments. (*Id.*) However, as described in more detail below, the Bloats misrepresented their combined and individual total gross monthly income in the Bloat Applications.

1. **Mr. Bloat Misrepresented his Gross Monthly Income in the Bloat Applications**

In the Bloat Applications, Mr. Bloat represented that he made $4,500 in gross monthly income in the form of pension plan payments as of the dates of the Bloat Applications. (*See* Baker Decl., its Ex. G, Bloat Applications.) However, records from the New York City Employees' Retirement System ("NYCERS") related to Mr. Bloat's pension plan reflect that from September 2005 through December 2006, Mr. Bloat *actually* made $2,300 in gross monthly income from NYCERS pension plan payments, not $4,500 as he represented in the Bloat Applications. (*See* Declaration of Sonya Grant ("Grant Decl.") at NYCERS000022-23, NYCERS Screenshots.)[1] The below redacted NYCERS excerpts confirm that Mr. Bloat misrepresented his gross monthly income in the Bloat Applications:

```
PENSION#          MEMBER#            NAME ROGER W            BLOAT
SS#               RET STAT S5    FD STAT PRF   PENSIONER'S OTHER SUFX 1
C
NOTICE DT:

MOYR    A.R.F.  PENSION  SUPLMT   GROSS    H.I.         TAX    U.D.  NET AMT CHG
0905 P   0.00   2300.00   0.00   2300.00   0.00         3.33   0.00  2296.67 *
1005 P   0.00   2300.00   0.00   2300.00   0.00         3.33   0.00  2296.67
1105 P   0.00   2300.00   0.00   2300.00  51.99  1NF    3.33   0.00  2244.68
1205 P   0.00   2300.00   0.00   2300.00  17.33  1NF    3.33   0.00  2279.34
1305 P   0.00   2300.00   0.00   2300.00  17.33  1NF    3.33   0.00  2279.34




  **  O T H E R   S U F F I X E S   E X I S T  **
         YTD TOTAL GROSS    9200.00   YTD TOTAL TAX    13.32
```

---

[1] NYCERS records also reflect that Mr. Bloat did not make $4,500 in gross monthly pension plan payments from NYCERS in 2007. (*See* Grant Decl. at NYCERS000024, NYCERS Screenshots.) In January 2007, Mr. Bloat received a pension plan payment from NYCERS in the amount of $3,926.85. (*Id.*) And from February 2007 through December 2007, Mr. Bloat received $2,391.36 in gross monthly pension plan payments from NYCERS. (*Id.*)

7

```
MOYR     A.R.F.  PENSION  SUPLMT   GROSS   H.I.         TAX    U.D.  NET AMT CHG
0106 P    0.00   2300.00   0.00   2300.00  17.33  1NF   0.00   0.00  2282.67
0206 P    0.00   2300.00   0.00   2300.00  17.33  1NF   0.00   0.00  2282.67 *
0306 P    0.00   2300.00   0.00   2300.00  17.33  1NF   0.00   0.00  2282.67
0406 P    0.00   2300.00   0.00   2300.00  17.33  1NF   0.00   0.00  2282.67
0506 P    0.00   2300.00   0.00   2300.00  17.33  1NF   0.00   0.00  2282.67
0606 P    0.00   2300.00   0.00   2300.00  17.33  1NF   0.00   0.00  2282.67
0706 P    0.00   2300.00   0.00   2300.00  17.33  1NF   0.00   0.00  2282.67
0806 P    0.00   2300.00   0.00   2300.00  17.33  1NF   0.00   0.00  2282.67
0906 P    0.00   2300.00   0.00   2300.00  17.33  1NF   0.00   0.00  2282.67
1006 P    0.00   2300.00   0.00   2300.00  17.33  1NF   0.00   0.00  2282.67 *
1106 P    0.00   2300.00   0.00   2300.00  17.33  1NF   0.00   0.00  2282.67
1206 P    0.00   2300.00   0.00   2300.00  17.33  1NF   0.00   0.00  2282.67 *
1306 P    0.00   2300.00   0.00   2300.00  17.33  1NF   0.00   0.00  2282.67
      **  OTHER   SUFFIXES   EXIST  **
          YTD TOTAL GROSS   27600.00   YTD TOTAL TAX    0.00
```

(*Id.*)

### 2. Mrs. Bloat Misrepresented her Gross Monthly Income in the Bloat Applications

In the Bloat Applications, Mrs. Bloat represented that she was employed by the School District of Palm Beach County, Florida ("Palm Beach School District") and that she made $5,200 in gross monthly base employment income as of the dates of the Bloat Applications. (*See* Baker Decl., its Ex. G, Bloat Applications.) However, Palm Beach School District records reflect that Mrs. Bloat did not make $5,200 per month in gross monthly base employment income as she represented in the Bloat Applications. (*See* Declaration of Stephanie Griffith ("Griffith Decl.") at PBSD000118-119, Employee Check History.) Instead, from December 2005 through March 2006, Mrs. Bloat *actually* made $3,214.32 in gross monthly base employment income (or $1,607.16 gross per pay period), not $5,200 as she represented in the Bloat Applications. (*Id.*) Additionally, in April 2006, Mrs. Bloat *actually* made $3,164.38 in gross monthly base employment income, not $5,200 as she represented in the Bloat Applications. (*See* Griffith Decl. at PBSD000119, Employee Check History.) Thereafter, Mrs. Bloat's gross monthly base employment income fluctuated from month-to-month as follows: (1) $2,915.10 in May 2006; (2) $6,233.09 in June 2006; (3) $0 in July 2006; (4) $3,399.86 in August 2006; (5) $3,683.18 in September and October 2006; (6) $4,691.18 in November 2006; (7) and $7,315.77 in December

8

2006.[2] (*See* Griffith Decl. at PBSD000119-120, Employee Check History.)

The below redacted Employee Check History excerpts from the Palm Beach School District confirm that Mrs. Bloat misrepresented her gross monthly employment income in the Bloat Applications:

```
Page: 1 Document Name: untitled

HPY710PB           P B C S D  -  C. H. I. P. S. - PAYROLL         HPY710M1
 Apr  6,11            CKHIST - Employee Check History (PE30)        5 MORE >
 *SSN:            LAST: BLOAT          FIRST: NEIRA      MI: I RET PLAN: HA
 START: 2000-01-01
   DATE  C CHECK#   DEP      GROSS        W/H       FICA     MEDI        NET
   ----- - -------  ---   ----------  ---------   -------  -------  ---------
   022406 1 A546775  Y       1607.16     131.63     93.22    21.80    1204.92
   021006 1 A525220  Y       1607.16     131.63     93.22    21.80    1204.92
   012706 1 A503232  Y       1607.16     131.63     93.22    21.80    1162.92
   011306 1 A480654  Y       1607.16     131.63     93.22    21.80    1204.92
   122205 1 A459916  Y       1607.16     125.43     93.34    21.83    1213.00
   121505 1 A435558  Y       1607.16     125.43     93.34    21.83    1213.00
   113005 1 A411845  Y       1651.16     136.43     96.07    22.47    1242.63
   111505 1 A386575  Y       1607.16     125.43     93.34    21.83    1213.00
   103105 1 A361168  Y       1607.16     125.43     93.34    21.83    1213.00
   101205 1 A337744  Y       1607.16     125.43     93.34    21.83    1213.00
```

```
Page: 1 Document Name: untitled

HPY710PB           P B C S D  -  C. H. I. P. S. - PAYROLL         HPY710M1
 Apr  6,11            CKHIST - Employee Check History (PE30)        5 MORE >
 *SSN:            LAST: BLOAT          FIRST: NEIRA      MI: I RET PLAN: HA
 START: 2000-01-01
   DATE  C CHECK#   DEP      GROSS        W/H       FICA     MEDI        NET
   ----- - -------  ---   ----------  ---------   -------  -------  ---------
   062906 1 A755626  Y          0.00       0.00      0.00     0.00      52.20
   062706 1 A742571  Y       3716.68     244.70    217.58    50.88    2892.34
   061506 1 A724511  Y       1357.88      94.24     77.76    18.19    1012.10
   060206 1 A701702  Y       1158.53      64.34     65.40    15.30     857.90
   051906 1 A676354  Y       1357.88      94.24     77.76    18.19    1012.10
   050506 1 A655362  Y       1557.22     124.14     90.12    21.08    1166.29
   042106 1 A631964  Y       1557.22     124.14     90.12    21.08    1166.29
   040706 1 A611017  Y       1607.16     131.63     93.22    21.80    1204.92
   031706 1 A587864  Y       1607.16     131.63     93.22    21.80    1204.92
   031006 1 A567999  Y       1607.16     131.63     93.22    21.80    1204.92
                           ==========  =========   =======  =======  =========
```

---

[2] The two months in which Mrs. Bloat made over $5,200 in gross employment income occurred after the dates of the Bloat Applications. Additionally, Palm Beach School District records reflect that Mrs. Bloat never made $5,200 in gross monthly employment income in 2007. (*See* Griffith Decl. at PBSD000121-123, Employee Check History.)

9

| Name | Check Dt | Empl Rcd# | Earns Begin | Earns End | Earn Code | Oth Hrs | Oth Earns |
|---|---|---|---|---|---|---|---|
| Bloat, Neira I | 8/11/2006 | 0 | 7/22/2006 | 8/4/2006 | PNE | 0.00 | $1,558.27 |
| Bloat, Neira I | 8/25/2006 | 0 | 8/5/2006 | 8/18/2006 | CRG | 0.00 | $1,841.59 |
| Bloat, Neira I | 8/25/2006 | 0 | 8/5/2006 | 8/18/2006 | ENP | 0.00 | -$212.49 |
| Bloat, Neira I | 9/8/2006 | 0 | 8/19/2006 | 9/1/2006 | CRG | 0.00 | $1,841.59 |
| Bloat, Neira I | 9/8/2006 | 0 | 8/19/2006 | 9/1/2006 | ENP | 0.00 | -$212.07 |
| Bloat, Neira I | 9/8/2006 | 0 | 8/19/2006 | 9/1/2006 | PNE | 0.00 | -$74.20 |
| Bloat, Neira I | 9/22/2006 | 0 | 9/2/2006 | 9/15/2006 | CRG | 0.00 | $1,841.59 |
| Bloat, Neira I | 9/22/2006 | 0 | 9/2/2006 | 9/15/2006 | ENP | 0.00 | -$212.07 |
| Bloat, Neira I | 9/22/2006 | 0 | 9/2/2006 | 9/15/2006 | PNE | 0.00 | -$74.20 |
| Bloat, Neira I | 10/6/2006 | 0 | 9/16/2006 | 9/29/2006 | CRG | 0.00 | $1,841.59 |
| Bloat, Neira I | 10/6/2006 | 0 | 9/16/2006 | 9/29/2006 | ENP | 0.00 | -$212.07 |
| Bloat, Neira I | 10/6/2006 | 0 | 9/16/2006 | 9/29/2006 | PNE | 0.00 | -$74.20 |
| Bloat, Neira I | 10/20/2006 | 0 | 9/30/2006 | 10/13/2006 | CRG | 0.00 | $1,841.59 |
| Bloat, Neira I | 10/20/2006 | 0 | 9/30/2006 | 10/13/2006 | ENP | 0.00 | -$212.07 |
| Bloat, Neira I | 10/20/2006 | 0 | 9/30/2006 | 10/13/2006 | PNE | 0.00 | -$74.20 |
| Bloat, Neira I | 11/3/2006 | 0 | 10/14/2006 | 10/27/2006 | CRG | 0.00 | $1,841.59 |
| Bloat, Neira I | 11/3/2006 | 0 | 10/14/2006 | 10/27/2006 | PNE | 0.00 | -$74.20 |
| Bloat, Neira I | 11/3/2006 | 0 | 10/14/2006 | 10/27/2006 | ENP | 0.00 | -$212.07 |
| Bloat, Neira I | 11/17/2006 | 0 | 10/28/2006 | 11/10/2006 | CRG | 0.00 | $1,841.59 |
| Bloat, Neira I | 11/17/2006 | 0 | 10/28/2006 | 11/10/2006 | PNE | 0.00 | -$74.20 |
| Bloat, Neira I | 11/17/2006 | 0 | 10/28/2006 | 11/10/2006 | ENP | 0.00 | -$212.07 |
| Bloat, Neira I | 11/17/2006 | 0 | 11/10/2006 | 11/10/2006 | BNS | 0.00 | $1,008.00 |
| Bloat, Neira I | 12/1/2006 | 0 | 11/11/2006 | 11/24/2006 | ENP | 0.00 | -$212.07 |
| Bloat, Neira I | 12/1/2006 | 0 | 11/11/2006 | 11/24/2006 | CRG | 0.00 | $1,841.59 |
| Bloat, Neira I | 12/1/2006 | 0 | 11/11/2006 | 11/24/2006 | PNE | 0.00 | -$74.20 |
| Bloat, Neira I | 12/1/2006 | 0 | 11/24/2006 | 11/24/2006 | PRF | 0.00 | $1,791.00 |
| Bloat, Neira I | 12/15/2006 | 0 | 11/25/2006 | 12/8/2006 | CRG | 0.00 | $1,841.59 |
| Bloat, Neira I | 12/15/2006 | 0 | 11/25/2006 | 12/8/2006 | PNE | 0.00 | -$74.20 |
| Bloat, Neira I | 12/15/2006 | 0 | 11/25/2006 | 12/8/2006 | ENP | 0.00 | -$212.07 |
| Bloat, Neira I | 12/22/2006 | 0 | 12/9/2006 | 12/22/2006 | CRG | 0.00 | $1,841.59 |
| Bloat, Neira I | 12/22/2006 | 0 | 12/9/2006 | 12/22/2006 | PNE | 0.00 | -$74.20 |
| Bloat, Neira I | 12/22/2006 | 0 | 12/9/2006 | 12/22/2006 | ENP | 0.00 | -$212.07 |

(*See* Griffith Decl. at PBSD000118-120, Employee Check History.)

Therefore, the Bloats misrepresented their individual and gross monthly employment income in the Bloat Applications. NYCERS records reveal that as of the dates of the Bloat Applications (January 4, 2006 and April 19, 2006), Mr. Bloat did not make $4,500 in gross monthly income from NYCERS pension plan payments. (*See* Grant Decl. at NYCERS000022-23, NYCERS Screenshots.) Similarly, Palm Beach School District records reveal that Mrs. Bloat did not make not $5,200 in gross monthly base employment income as of the dates of the Bloat Applications. (*See* Griffith Decl. at PBSD000118-119, Employee Check History.)

**C.   1ST NEW ENGLAND'S FAILURE TO REPURCHASE OR PROVIDE INDEMNITY FOR THE BLOAT LOANS**

1st New England breached the representations, warranties, and covenants contained in Sections 703(1) and (12) of the Seller's Guide with respect to the Bloat Loans because the Bloat

Applications that 1st New England submitted to LBB contained misrepresentations and untrue statements of fact related to the Bloats' gross monthly income. Accordingly, Aurora and LBHI both sent written notice and demand to 1st New England requesting that it repurchase the Bloat Loans or provide indemnity for the losses sustained on the Bloat Loans. (*See* Baker Decl. at ¶ 10, its Ex. H) To date, however, 1st New England has failed and/or refused to repurchase or provide indemnity for the Bloat Loans.

## II. ARGUMENT & AUTHORITIES

### A. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the standard requires that there be no *genuine* issue of *material* fact. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986) (emphasis added).

### B. LBHI IS ENTITLED TO SUMMARY JUDGMENT ON ITS CLAIM FOR BREACH OF CONTRACT

Both the Agreement and the Seller's Guide contain choice-of-law provisions that provide for the application of New York law. (*See* Baker Decl., its Ex. A, Agreement at Section 8; its Ex. B., Seller's Guide at 713.1; *see also Lehman Bros. Holdings, Inc. v. Loan Network, LLC,* No. C09-1026-TSZ, 2010 WL 4553674, at *2 (W.D. Wash. Nov. 3, 2010).) The elements of a breach of contract claim under New York law are: "(1) the existence of a contract; (2) due performance of the contract by the plaintiff; (3) breach of contract by the defendant; and (4) damages resulting from the breach." *See Marks v. New York Univ.*, 61 F Supp 2d 81, 88 (S.D.N.Y. 1999).

### 1. The Agreement Constitutes a Valid Contract

There is no dispute that a valid contract exists here. 1st New England entered into the Agreement with LBB on September 2, 2004. (*See* Baker Decl. at ¶ 2, its Ex. A, Agreement.) The Agreement, which specifically incorporates the Seller's Guide, governs LBB's purchase of the Bloat Loans. (*See* Baker Decl. at ¶ 3, its Ex. B, Seller's Guide.) Following the execution of the Agreement, LBB assigned the Bloat Loans to LBHI and thereafter assigned its rights related to the Bloat Loans under the Agreement to LBHI, including all rights regarding the representations, warranties, and covenants 1st New England made in the Agreement and Seller's Guide related to the Bloat Loans, as well as all rights to the repurchase and indemnity remedies contained therein. (*See* Baker Decl. at ¶ 5, its Exs. D-F, Bloat First and Second Note, Whole Loan Tracking, and Assignment, respectively.)

### 2. LBHI Performed Its Obligations Under the Agreement

On or about May 17, 2006, LBB purchased the Bloat First Loan for $394,125.31 and the Bloat Second Loan for $93,659.76. (*See* Baker Decl. at ¶ 6, its Ex. C, Purchase Advices.) Accordingly, LBB and LBHI performed their obligations under the Agreement and Seller's Guide because LBB paid 1st New England for the Bloat Loans and took possession of them.

### 3. 1st New England Breached the Agreement and Seller's Guide

Under New York law, when a party makes representations in a loan purchase agreement that turn out to be false, such misrepresentations constitute a breach of the loan purchase agreement. *See Resolution Trust Corp. v. Key Fin. Svcs., Inc.*, 280 F.3d 12, 16-19 (1st Cir. 2002). Additionally, pursuant to New York law, a loan seller's failure to repurchase loans that do not conform with the parties' contract upon demand as required by the contract is an independent breach of the contract and entitles a plaintiff to pursue general contract remedies for breach of contract. *See LaSalle Bank Nat'l Ass'n v. Lehman Brothers Holding, Inc.*, 237 F.Supp.2d 618,

638 (D. Md. 2002) (*citing Resolution Trust Corp.*, 280 F.3d at 17-18 (stating "[a] repurchase provision is designed to shift the risk to the selling party in the event that a dispute arises.").

In this case, there can be no legitimate dispute that 1st New England breached the representations, warranties, and covenants it made to LBB in the Seller's Guide. First, 1st New England breached Sections 703(1) and (12) of the Seller's Guide with respect to the Bloat Loans because the Bloat Applications that 1st New England submitted to LBB contained misrepresentations and untrue statements of fact related to the Bloats' gross monthly income. Second, 1st New England breached the representations, warranties, and covenants contained in Sections 710 and 711 by failing to repurchase the Bloat Loans or provide indemnity on the losses sustained on the Bloat Loans after it became known that the Bloats misrepresented their gross monthly income in the Bloat Applications.

### (i) 1st New England Breached the Representations it Made to LBB in Sections 703(1) and (12) of the Seller's Guide

There is no dispute that 1st New England breached the representations, warranties, and covenants contained in Sections 703(1) and (12) because the Bloat Applications that 1st New England submitted to LBB contained misrepresentations and untrue statements of fact related to the Bloats' combined and individual gross monthly income.[3] *See Resolution Trust Corp.*, 280 F.3d at 16-19. In Section 703(1), 1st New England represented that no document, report, or material furnished to LBB in the Bloat Loans file or related to the Bloat Loans, including, without limitation, the Bloat Applications, was falsified or contains any untrue statement of fact. (*See* Baker Decl., its Ex. B, Seller's Guide § 703(1).) Similarly, in Section 703(12), 1st New

---

[3] The Bloats' combined and individual gross monthly income, including, without limitation, Mr. Bloat's pension plan payments and Mrs. Bloat's base employment income, were material to LBB's decision to purchase the Bloat Loans from 1st New England. (*See* Baker Decl. at ¶ 9.) Misrepresentations of borrower income have a material and adverse effect upon the interests of LBB and LBHI for several reasons. (*Id.*) First, LBHI cannot sell the loan at full value to another investor once a misrepresentation of income is discovered. (*Id.*) Second, if LBHI sells the loan to an investor and a misrepresentation of income is thereafter discovered, LBHI is generally required to repurchase the loan or provide a "make whole" payment to the investor. (*Id.*) Third, when borrowers misrepresent their income, they often will not be able to make the payments on the loan and it will go into default. (*Id.*)

13

England represented that the documents, instruments, and agreements submitted for loan underwriting were not falsified and contain no untrue statement of material fact. (*See* Baker Decl., its Ex. B, Seller's Guide § 703(12).)

The Bloats falsified and misrepresented their combined and individual gross monthly income in the Bloat Applications. With respect to Mr. Bloat, NYCERS records confirm that prior to, during, and after the dates of the Bloat Applications (January 4, 2006 and April 19, 2006), Mr. Bloat did not make $4,500 in gross monthly income from NYCERS pension plan payments as he represented in the Bloat Applications. (*See* Grant Decl. at NYCERS000022-24, NYCERS Screenshots.) Instead, from September 2005 through December 2006, Mr. Bloat *actually* received $2,300 in gross monthly income from NYCERS pension plan payments. (*Id.* at NYCERS000022-23.) In January 2007, Mr. Bloat received a NYCERS pension plan payment in the amount of $3,926.85. (*Id.* at NYCERS000024.) And from February 2007 through December 2007, Mr. Bloat received $2,391.36 in gross monthly income from NYCERS pension plan payments. (*Id.*)

And with respect to Mrs. Bloat, Palm Beach School District records confirm that prior to, during, and after the dates of the Bloat Applications (January 4, 2006 and April 19, 2006), Mrs. Bloat did not make $5,200 per month in gross monthly base employment income as she represented in the Bloat Applications. (*See* Griffith Decl. at PBSD000118-123, Employee Check History.) Instead, from December 2005 through March 2006, Mrs. Bloat *actually* made $3,214.32 in gross monthly employment income (or $1,60.16 gross per pay period), not $5,200 as represented in the Bloat Applications. (*Id.*) In April 2006, Mrs. Bloat *actually* made $3,164.38 in gross monthly employment income, not $5,200 as represented in the Bloat Applications. (*Id.* at PBSD000119.) After the date of the Bloat Second Application (April 19, 2006), Mrs. Bloat's gross monthly income varied, but she only received more than $5,200 in

14

gross monthly base employment income for the months of June 2006 and December 2006. (*Id.* at PBSD000119-120.) Palm Beach School District records also reflect that Mrs. Bloat never made $5,200 in gross monthly base employment income in 2007. (*Id.* at PBSD000121-123.)

> *(ii)* *The Seller's Guide Imposes an Independent Obligation on 1st New England to Ensure the Accuracy of any Loan Application Submitted to LBB, Regardless of Whether a Loan is a Stated Income Loan*

1st New England sold the Bloat Loans to LBB as stated income loans. (*See* Baker Decl. at ¶ 4.) LBHI anticipates that 1st New England will contend that it did not breach the Seller's Guide because the Bloat Loans were stated income loans and 1st New England was not required to verify the Bloats' gross monthly income. A similar argument, however, was recently addressed and rejected in *Young America Mortgage Corp. v. ING Bank, FSB,* No. B219955, 2011 WL 591339 at *1 (Cal. Ct. App. Feb. 22, 2011) (unpublished). In that case, a purchaser of a mortgage loan sued a mortgage broker alleging breach of a broker origination agreement for submitting a loan application to the purchaser that misrepresented the borrower's monthly income. (*Id.*) The mortgage broker argued that it was under no duty to verify the borrower's income because the loan was a stated income loan pursuant to the incorporated lending guidelines and therefore it needed only to ask the borrower his income, which the mortgage broker claimed it did. (*Id.* at *4.) The Court of Appeals held that the purchaser established that the mortgage broker breached the broker origination agreement:

> Section 10, subdivision (bb) of the Broker Origination Agreement states that YAM "shall not submit a Loan Application Package where the information contained in the application or other document submitted in connection with the loan application is not true, correct and undisputed and does not reflect full, correct and accurate information as to the matter represented." This clause does not contain any qualifying language indicative of a scienter element, such as "knowingly" or "intentionally." (*See generally Margarito v. State Athletic Com.* (2010) 189 Cal.App.4th 159, 168.) We therefore agree that the Agreement imposed an unambiguous, absolute duty on YAM to submit truthful salary information in any loan application, which it admittedly failed to do.

15

<pre>                                      * * *</pre>

> . . . the Broker Origination Agreement imposed an independent obligation on YAM to ensure the accuracy of any loan application that it submitted to ING.

(*Id.* at *4-5.*)

Similar to the broker origination agreement in *Young America Mortgage Corp.*, Sections 703(1) and (12) of the Seller's Guide do not contain any qualifying language indicative of a scienter element, such as "knowingly" or "intentionally." (*Id.* at *4-5; see also* Baker Decl., its Ex. B, Seller's Guide §§ 703(1), (12).) Even though a borrower's income is disclosed, but typically not verified under a stated income loan, Sections 703(1) and (12) of the Seller's Guide impose an independent obligation on 1st New England to ensure the accuracy of the information submitted to LBB in the Bloat Applications. (*Id.*) Therefore, any argument that 1st New England did not breach the Agreement and Seller's Guide because it was not required to substantiate the Bloats' income due to the Bloat Loans being stated income loans is without merit.

### (iii)  1st New England Breached Sections 710 and 711 by Failing to Repurchase or Provide Indemnity on the Bloat Loans

As a result of the misrepresentations and untrue statements of fact contained in the Bloat Applications, 1st New England was required to repurchase the Bloat Loans or indemnify LBHI for the losses sustained on the Bloat Loans pursuant to Sections 710 and 711 of the Seller's Guide. (*See* Baker Decl., its Ex. B, Seller's Guide §§ 710 and 711.) Aurora and LBHI both sent written notice and demand to 1st New England requesting that it repurchase the Bloat Loans. (*See* Baker Decl. at ¶ 10, its Ex. H.) Pursuant to Section 710 of the Seller's Guide, 1st New England was required to repurchase the Bloat Loans within thirty (30) days of demand, but failed and/or refused to do so. (*See* Baker Decl. at ¶ 10, its Ex. B, Seller's Guide § 710.)

Accordingly, 1st New England breached Sections 710 and 711 of the Seller's Guide by failing to repurchase the Bloat Loans after it became known that the Bloats misrepresented their gross monthly income in the Bloat Applications. *See LaSalle Bank*, 237 F. Supp. 2d at 638 (holding that a failure to repurchase loans that do not conform with the parties' contract upon demand as required by the contract is an independent breach of the contract). To date, 1st New England has not repurchased or provided indemnity for the Bloat Loans and is in breach of its obligations under the Agreement and Seller's Guide. (*See* Baker Decl. at ¶ 10.)

### 4. LBHI has Suffered Recoverable Damages

Although LBHI does not seek summary judgment on the amount of damages it suffered at this time, LBHI sustained damages because of 1st New England's breaches of the Agreement and Seller's Guide. Before applying interest, costs, and attorney fees, LBHI sustained $183,000.43 in damages on the Bloat First Loan and $105,616.28 in damages on the Bloat Second Loan. (*Id.* at ¶ 11.) Thus, before applying interest, costs, and attorney fees, LBHI sustained $288,616.71 in damages on the Bloat Loans. (*Id.*)

## C. LBHI IS ENTITLED TO RECOVER ITS ATTORNEY FEES

LBHI is entitled to the attorney fees it incurred in this action. Under New York law, attorney fees may be awarded when authorized by agreement, statute, or court rule. *Granada Condo. I v. Morris*, 639 N.Y.S.2d 91, 93 (N.Y. App. Div. 1996). Pursuant to Section 711 of the Seller's Guide, 1st New England agreed that it "shall pay the reasonable attorney's fees of Purchaser incurred in enforcing [1st New England's] obligations hereunder, including, without limitation, the repurchase obligation . . . ." (*See* Baker Decl., its Ex. B., Seller's Guide § 711.)

In this case, LBHI hired Locke Lord LLP to prosecute this action against 1st New England. (*See* Baker Decl. at ¶ 12.) LBHI has incurred in excess of $150,000.00 in attorney fees and costs because of 1st New England's breaches of the Agreement and Seller's Guide. (*Id.*) At

this time, however, LBHI hereby seeks summary judgment on 1st New England's liability for attorney fees, but does not request that the Court rule on the amount of fees at this time. LBHI will provide the amount and reasonableness of its attorney fees at a later date.

### III. CONCLUSION

For the reasons discussed above, LBHI respectfully requests that the Court grant its Motion for Summary Judgment on 1st New England's liability for breach of the Agreement and Seller's Guide, liability for attorney fees, and such other and further relief to which it may be justly entitled.

LEHMAN BROTHERS HOLDINGS INC.

By its Attorneys,

LOCKE LORD LLP

/s/   Jason L. Sanders
Katherine Heid Harris (BBO # 658549)
111 South Wacker Drive
Chicago, Illinois 60606
(312) 443-1713
(312) 896-6713 (Fax)

Robert T. Mowrey, Pro Hac Vice
Jason L. Sanders, Pro Hac Vice
2200 Ross Avenue, Suite 2200
Dallas, Texas  711201
(214) 740-8000
(214) 740-8800 (Fax)

Kent C. Modesitt
(Pro Hac Vice application to be filed)
REILLY POZNER LLP
511 16th Street, Suite 700
Denver, Colorado 80202
(303) 893-6100
(303) 893-6110 (Fax)

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(A)(2)

I, Jason Sanders, hereby certify that pursuant to District of Massachusetts Local Rule 7.1(A)(2) that I have conferred with counsel for 1st New England about the issues presented by this brief and have attempted in good faith to resolve and/or narrow the issues, but judicial resolution remains necessary.

/s/ Jason L. Sanders
Jason L. Sanders

## CERTIFICATE OF SERVICE

I, Jason L. Sanders, hereby certify that on December 21, 2011, I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which will send electronic notification of such filing to all parties of record.

/s/ Jason L. Sanders
Jason L. Sanders
