**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

| | |
|---|---|
| **LEHMAN BROTHERS HOLDINGS INC.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Civil Action No. 09-cv-11082-GAO** |
| ) | |
| **FIRST NEW ENGLAND MORTGAGE** ) | |
| **CORPORATION dba ABERDEEN** ) | |
| **MORTGAGE and FNE MORTGAGE,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON LIABILITY

Defendant First New England Mortgage Corporation *dba* Aberdeen Mortgage and FNE Mortgage ("FNE") submits this Memorandum In Opposition To The Motion for Summary Judgment On Liability filed by Plaintiff Lehman Brothers Holdings, Inc.

Plaintiff Lehman Brothers Holding, Inc. ("Lehman") has brought this action alleging that it is the currently the owner of two mortgage loans, a $389,500 first mortgage and a $96,300 second mortgage executed by Roger and Neira Bloat on or about April 19, 2006 and secured by the Bloats' residence in Palm Beach, Florida. FNE, which is located in Newton, MA, acted as a correspondent seller for Lehman in the origination of the Bloats' mortgages. The Bloats have defaulted on the mortgages and Lehman has brought suit against FNE for damages arising from FNE's alleged refusal to repurchase the mortgages back from Lehman. Lehman alleges that FNE is required to repurchase the loans for the sole reason that the Bloats misrepresented their income on the loan application. FNE denies that it is required to repurchase the mortgages from Lehman and asserts that Lehman has failed to meet its burden of showing it is entitled to a summary judgment as a matter of law on the question of FNE's liability for breach of contract.

<u>**FACTS**</u>

FNE, which currently has 19 employees, is a small family owned mortgage brokerage business located in Newton, Massachusetts. FNE is dedicated to the highest ethical standards and business practices. In its twenty four (24) years of existence, FNE has an unblemished record both with state regulators and consumer advocacy organizations alike. FNE is a long-standing member of the Better Business Bureau. *See* Declaration of Bradley T. Black ("Black Decl."), ¶¶ 1-2.

In September, 2004, FNE executed a standard form loan purchase agreement (*See* Exhibit A to Declaration of John Baker "Baker Decl.") with Lehman Brothers Bank, FSB ("LBB") in which FNE became a Correspondent Seller of LBB and its affiliated company, Aurora Loan Services, Inc. ("Aurora"), to sell mortgage loans meeting LBB's and Aurora's loan guidelines. The loan purchase agreement was drafted entirely by LBB and FNE was not permitted to negotiate the terms of these agreements in any way. Lehman was one of the largest, if not the largest purchaser of mortgage loans in the entire industry. Correspondent sellers and mortgage brokers like FNE essentially act as the sales arm for large institutional investors such as Lehman. *See* Black Declaration, ¶3.

**A.    The Industry Had A Widespread Practice Of Using Stated Income Loans In Which The Borrower's Stated Income Was Not A Material Factor.**

In the decade prior to the economic collapse of 2008, mortgage market participants introduced a number of alternative mortgage products with criteria significantly less stringent than traditionally employed. These products typically were priced to produce higher returns to compensate for the additional risk associated with the program characteristics. An almost universal practice in these programs was the elimination of some specific verification(s) of factors previously considered essential. These eliminations constituted a tacit acknowledgement

that the items not verified were not essential to the underwriting process and therefore not material in the underwriting decision. *See* Declaration of Alan Blocher, ¶ 2.

One of the most common of these alternative programs, employed by many lenders, was usually called something like a "Stated Income Loan." While there were minor differences from lender to lender, there were many characteristics in common. Normally, property values and borrower credit history and assets were verified in traditional ways, including obtaining independent property appraisals, credit reports and bank statements. *See* Declaration of Alan Blocher, ¶ 3.

However, the borrower's income typically was not verified and verification of employment was done in a non-traditional way. Rather than obtaining a written verification of what prospective borrowers had listed on their application, the employer would be asked to confirm (frequently orally) the employment claimed but not the actual income from that employment. In many of these programs, verification of income was discouraged or actually forbidden. *See* Declaration of Alan Blocher, ¶ 4.

It must be noted that employment income could have been confirmed as readily and simultaneously with the existence of the employment itself. The failure to require that confirmation reveals the low priority given to that factor. *See* Declaration of Alan Blocher, ¶ 5.

With regard to such Stated Income loans, therefore, the custom and practice in the mortgage loan industry was that the borrower's unverified income as stated on the borrower's loan application was not a material factor in the underwriting of such loans. *See* Declaration of Alan Blocher, ¶ 6.

Similarly, the borrower's stated income was not seen in the industry as a material factor in the corresponding purchase and sale of such Stated Income loans, which were often purchased by large investment banks and bundled with other loans to be re-sold as mortgage backed

securities. This was particularly true when the purchasing investment bank had originally underwritten and approved the loan in accordance with its own published underwriting guidelines for Stated Income loans prior to the loan being funded by and then subsequently purchased from one of its own correspondent mortgage bankers. *See* Declaration of Alan Blocher, ¶ 7.

**B.** **Aurora Approves Two Stated Income Mortgages For The Bloats**.

On January 4, 2006, Roger and Neira Bloat submitted a mortgage loan application to FNE for the purchase of a home in Florida. (*See* Baker Decl., Ex. G). The Bloats listed a combined monthly income of $14,400. FNE submitted the loan application for review and approval to Aurora's underwriters in accordance with Aurora's "Limited Doc" (also known as "Stated Income") loan program, which did not require income verification and, in fact, prohibited FNE from conducting any income verification in order to qualify for the stated income program. Thus, in submitting loans for approval under Lehman's stated income loan program, FNE was representing to Lehman that FNE had not verified the borrowers' income, as directed by Lehman. In so doing, FNE was thereby disclosing to Lehman that FNE was not in a position to vouch for the accuracy of the borrower's income. FNE thus denies that it represented at any time that the Bloat's stated income was accurate. These types of stated income loans came to be known as "liar loans" as borrowers applying for such loans often overstated their incomes knowing that verification of income would not be performed. Nevertheless, Aurora's underwriters approved the Bloats' loan application in writing. Attached as Exhibit 1 to the Black Declaration are true and correct copies of Aurora's Underwriting Approval Notices for the Bloats' loans, which were provided to FNE prior to funding the loans. On April 19, 2006, the Bloats executed a note and first mortgage in the amount of $389,500 and a note and second mortgage in the amount of $96,300. (*See* Baker Decl., Ex. D). The only condition set forth in

4

Aurora's written loan approval was for FNE to verbally verify Neira Bloat's employment, which was done two days prior to the closing. FNE performed no underwriting with respect to the Bloats' loans, and played no role in the approval of the same. *See* Black Declaration, ¶4.

The loans to the Bloats were made in strict accordance with Aurora's underwriting guidelines and the loan application was specifically reviewed and approved by Aurora's underwriters prior to the loan being made. *See* Deposition of Lehman's representative, John Robert Baker, III, page 47 ("Baker Depo."), attached as Exhibit 1 to the Declaration of Andrew C. Gately, Esq. Aurora solely made the decision to lend money to the Bloats. *Id*. FNE acted merely as a conduit for the origination of the loan. Aurora was not obligated to approve any loan if it believed that there was a reason not to proceed with loan underwriting. *See* Baker Depo., page 47-48. Aurora did not prevent the Bloats' loan from proceeding through underwriting and, in fact, approved the loan being funded. *See* Black Declaration, ¶5.

As noted, Aurora's limited doc loan program specifically provided for loans to be made without verification of the borrower's income. Attached as Exhibit 2 to the Black Declaration is a true and correct copy of Aurora's "Alt-A Product Profile" setting forth its underwriting requirements for each of its loan programs. For the "limited doc" program, Aurora's Product Profile clearly states that "Verification of income is not required." See Exhibit 2, page 2. It further states that "Ratios are calculated based on stated income." *Id*. In fact, FNE had been advised by Aurora on numerous occasions that FNE was prohibited from verifying income in order for loans to be considered for the limited doc or stated income program. Aurora was able to charge a higher interest rate for such stated income programs compared to full documentation loans. Limited doc loans were extremely popular and widespread in the industry prior to the collapse of the real estate market in 2008. Aurora determined that the Bloats' application held

up to industry underwriting standards and Aurora's limited doc loan program, as evidenced by its approval and funding of the loan. *See* Black Declaration, ¶6.

Aurora concluded that the Bloats' income information provided in their application also met the required underwriting standards for the Aurora stated income loan program, which required that "Income must be reasonable for the employment disclosed." See Black Decl., Exhibit 2, page 2. Aurora thus determined that the underwriting standards for reasonableness for the Bloats' reported income was met in light of the sources of income identified by the Bloats. Aurora thus made its own determination as to whether the Bloats had accurately represented their income at origination by underwriting and approving the loan and making the lending decision without requiring further documentation supporting the Bloats' reported income level. *See* Black Declaration, ¶7.

During the underwriting process for the Bloats' loans, there was also a verification of asset account indicating over $103,000, which Aurora determined backed up the income data on the application. The credit report indicated employment history for Roger Bloat with the Department of Corrections and for Neira Bloat with the Department of Education. As Neira was still employed, there was also a verbal Verification of Employment (later substantiated by Lehman more than a year after the suit was filed). Aurora determined that the credit report backed up the application information, which is a common underwriting practice to cross reference. As noted, FNE was not allowed to verify income, only employment for Neira Bloat. *See* Black Declaration, ¶8.

C.      **The Bloats Default On The Mortgages And Lehman Makes Demand On FNE To Repurchase, But Then Does Nothing To Respond To FNE's Request For Information Or To Foreclose On The Collateral**.

By early 2007 the Bloats' loans apparently went into default. In a letter dated June 6, 2007, Aurora made demand for FNE to repurchase the Bloat loan alleging that the Bloats had

misrepresented their income on the loan application.  Attached as Exhibit 3 to the Black

Declaration is a true and correct copy of Aurora's June 6, 2007 letter to FNE.  The sole basis for

this allegation was a subsequent financial statement submitted to Aurora by the Bloats in

February, 2007 as part of a request to modify the loans (*See* Baker Decl. Exhibit H), which

showed a combined income of $8,838, rather than the combined income of $14,400 indicated on

the Bloats' original loan application in January and April, 2006.  Lehman's letter stated that "The

basis for our findings is set forth in the attached analysis along with a copy of the relevant

supporting documentation."   *See* Black Decl., Exhibit 3.  However, no analysis was attached and

the only supporting documentation enclosed with the letter was a copy of the Bloats' February,

2007 financial statement in support of their request for a loan modification after defaulting on the

mortgages.  Aurora's June 6, 2007 letter further advised FNE that alternatives to repurchasing

were available, such as repricing the loan.  *Id*.  The letter further requested that FNE respond

within thirty days if FNE refuted Aurora's findings, and to contact Cristina Burk at Aurora to

discuss the mechanics of a repurchase, calculation of the repurchase price or alternatives to

repurchase.  *See* Black Declaration, ¶9.

Lehman has also produced documents in this litigation showing that the Bloats provided

an explanation to Aurora for their inability to pay their mortgage in correspondence dated March

2, 2007 in which the Bloats explained that nonpayment was due to Neira Bloat's surgery and

interruption in Roger Bloat's pension payments due to paperwork not being submitted providing

proof of marital status.  Attached as Exhibit 4 to the Black Declaration are true and correct

copies of correspondence from the Bloats regarding their loan hardship.  *See* Black Declaration,

¶10

On June 18, 2007, Bradley Black of FNE responded in writing to Aurora's repurchase

demand, stating:

> In your letter you indicate that the Bloat's had provided some paperwork to you showing income in March of 2007 of $8,838. I am not sure why you have suggested that the Bloat's had misrepresented income as the two periods are basically a year apart and I can't compare the detail of income without the 2 sets of data. If there is more detailed information you can provide to me I will look at it further.

> I would like to work together with you to make sure there is not any unresolved issue with the Bloat loan. Please contact me with additional information or let me know that you have cleared up the issue in question.

Attached as Exhibit 5 to the Black Declaration is a true and correct copy of Mr. Black's June 18, 2007 letter to Christina Burk of Aurora. In their complaint, Lehman has characterized this response as a "refusal" to repurchase the loan, when in fact, FNE was merely asking for additional information and the basis for Lehman's allegation that the Bloats had misrepresented their income in their original loan application given that the two financial statements being relied upon by Aurora were nearly one year apart in date. As requested in Aurora's letter, FNE was further providing evidence to refute the allegation that the loan was based on misrepresented income by pointing out that the allegation was based solely on a financial statement that was dated nearly a year after the loan closed. Many things could explain the difference in income reported by the Bloats over this nearly one year period besides the unsupported conclusion that the Bloats had misrepresented their income in their original loan application. *See* Black Declaration, ¶11.

On July 20, 2007, Aurora's Cristina Burk replied to Mr. Black via email, stating:

> Hi Brad and thank you for your response, which I am currently reviewing. I will contact you next week to discuss my findings. Thanks again.

Attached as Exhibit B to the Black Declaration is a true and correct copy of Ms. Burk's email to Mr. Black dated July 20, 2007. But FNE never heard back from Ms. Burk or anyone else from Aurora or Lehman. This naturally led FNE to conclude that Aurora and/or Lehman had decided not to pursue the repurchase demand. It was only two years later, on or about June 24, 2009,

upon receiving a copy of Lehman's complaint in this matter, that FNE learned for the first time that Lehman was claiming a breach of contract for FNE's "refusal" to repurchase the Bloat loans. *See* Black Declaration, ¶12.

In addition to Aurora's complete failure to respond to FNE's request for additional information and/or discuss a possible resolution of the matter, in the intervening two years between the Bloats' default and Lehman's lawsuit against FNE, Lehman further failed to secure its collateral and foreclose on the Bloats' home. Rather, Aurora allowed the Bloats' mortgage default to linger and essentially did nothing during this crucial two year period, during which the real estate market collapsed (particularly so in South Florida) and the value of the collateral decreased in value by at least fifty percent. Upon information and belief, Lehman has failed to foreclose on the property to date[1]. *See* Black Declaration, ¶13.

### D. Lehman Sold The Loans To Third Parties But Then Bought The Loans Back As A Volunteer And Not Because Of Any Legal Duty.

According to Lehman's records and the deposition of its representative, Mr. Baker, the ownership of the Bloats' loans followed the typical course established by Lehman's business model, which was to buy loans and package them with other loans and resell them as mortgage backed securities. (*See* Baker Decl., Exhibit E). As Mr. Baker testified:

> **Q**.  Okay. Now, as I understand it, for correspondent loans that were purchased by Lehman Brothers Bank, Lehman Brothers Bank would, in turn, sell those loans to Lehman Brothers Holdings, Inc.?
>
> **A**.  That was the model, yeah. It didn't happen in 100 percent of the cases, but that was the general model, and that's what happened with the BLOAT loans.

---

[1] Although not an issue to be decided by the present motion, New York law imposes upon a party subjected to injury from breach of contract, the duty of making reasonable exertions to minimize the injury. *Wilmot v. State of New York,* 32 NY2d 164, 168-169; *Losei Realty Corp. v City of New York,* 254 NY 41, 47). FNE contends that Lehman failed to take reasonable steps to mitigate its damages in this matter.

*See* Baker Depo. (attached as Exhibit 1 to Gately Decl.), pp. 21.  Mr. Baker, in his declaration, stated that "After LBB purchased the Bloat loans from 1st New England, LBB assigned them to LBHI[2]."  See Baker Decl., ¶ 5.  Exhibit E to the Baker Declaration further reveals that Lehman went on to securitize and sell both the first and second Bloat mortgages to an entity called Structured Asset Security Corp., which in turn sold the first mortgage to a trust known as LSX 2006-09 and the second mortgage to a trust known as SASCO 2006-03, the ownership trail for both mortgages being summarized as follows:

**First Mortgage (loan # "8820")**

| | |
|---|---|
| 05-17-06 | LBB buys from FNE |
| 06-30-06 | Lehman buys from LBB |
| 06-30-06 | Structured Asset Security Corp. buys from Lehman |
| 06-30-06 | LSX 2006-009 buys from Structured Asset Security Corp. |
| 03-19-08 | Lehman buys back from LSX 2006-09 (through Aurora) |

**Second Mortgage (loan # "9018")**

| | |
|---|---|
| 05-17-06 | LBB buys from FNE |
| 08-30-06 | Lehman buys from LBB |
| 08-30-06 | Structured Asset Security Corp. buys from Lehman |
| 08-30-06 | SASCO 2006-03 buys from Structured Asset Security Corp. |
| 07-19-07 | Lehman buys back from SASCO 2006-03 (through Aurora) |
| 03-26-08 | Lehman charges off |

---

[2] In its motion papers, plaintiff Lehman Brothers Holdings, Inc. refers to itself as "LBHI", while FNE refers to plaintiff as "Lehman" in these opposition papers.  For purposes of the motion, therefore, the parties are referring to the same entity (i.e. the plaintiff herein) when they refer to LBHI and Lehman in their respective papers.

**Assignment from LBB to Lehman**

09-02-08          LBB assigns its rights under repurchase agreements with correspondents
                  to Lehman

*See* Baker Decl., Exhibit E, and Baker Depo. (attached as Exhibit 1 to Gately Decl.), pp. 21-25,

28-37.

      However, in both its motion papers and in the deposition of its designated representative,

Mr. Baker, Lehman has not produced any evidence showing that it was required to repurchase

the loans back from the trusts (i.e. LSX 2006-009 and SASCO 2006-03) that it had sold the loans

to previously.  In fact, Mr. Baker testified that Lehman bought the loans back at the direction of

Aurora, its own subsidiary:

> **Q**.     All right. So -- just so I'm clear, you
> believe that it was Aurora Loan Services that made the
> determination to make a demand on Lehman Brothers Holdings
> to repurchase the Bloat loan?
>
> **A**.     Yeah. Master Servicing, the division of
> Aurora Loan Services, that in this case was
> master-servicing the loans on behalf of the trust made a
> demand to Lehman Brothers Holdings to repurchase it.

See Baker Depo (attached as Exhibit 1 to Gately Decl.), p. 32.

> **Q**.     Now, do you know whether anyone at the trust
> directed Aurora to make a demand on Lehman to repurchase
> the Bloat loan?
>
> **A**     No, I don't know that for Bloat.

*See* Baker Depo. (attached as Exhibit 1 to Gately Decl.), p. 33.  Based on the evidence presented

by Lehman, therefore, Lehman bought the loans back voluntarily at the request of its own

subsidiary, Aurora, and not as a result of any legal obligation and/or even a demand from the

then current owners of the loans.  Moreover, when Aurora first made demand on FNE on June 6,

2007 to repurchase the loans, the records produced by Lehman in this litigation show that neither

Aurora nor LBB nor Lehman were the owners of the loans.

**E.** **The Income Information Obtained By Lehman in 2011 From The Bloats' Employers Does Not Prove That The Bloats Misrepresented Their Income, Or That The Income Figures Cited Would Have Changed The Underwriting Analysis For The Bloat Loans.**

Lacking any basis in support of its contention that the Bloats misrepresented their income on their April, 2006 loan application, Lehman has obtained documents in discovery in this lawsuit from the Bloats' employers that Lehman alleges show that the Bloats actual monthly income in 2006 was $7,689. Such documents do not prove conclusively, however, whether the Bloats misrepresented their income or may have had other income not reflected in such records, such as income from tutoring by Neira Bloat, which is common for teachers, or income earned on the weekends by Roger Bloat, which he indicated in a letter to Lehman in March, 2007 that he regularly earned. (See Exhibit 4). *See* Black Declaration, ¶14

The Bloats have refused to appear for depositions and discovery in this matter and thus Lehman has been unable to prove that the Bloats misrepresented their income in their loan application. *See* Black Declaration, ¶15.

Even using the income figures contained in the documentation obtained in discovery by Lehman does not definitively prove that Aurora's underwriting guidelines would not have been met using standard mortgage underwriting principles. For instance, the custom and practice in the mortgage industry is that when analyzing retirement pay for underwriting purposes, such income is considered as net pay and should be "grossed up" for qualifying purposes. The most common factor used in the industry, including by Aurora, to gross up net income is 0.7. *See* Black Declaration, ¶16.

According to the retirement award documents from NYC obtained by Lehman (*See* Burcham Declaration, Exhibit A: NYCERS000017), Mr. Bloat's annual retirement pay was indicated to be $33,126, which equals $2,760 monthly and under standard practice in the industry treated as net pay and typically "grossed up" for underwriting purposes as follows:

Income for Mr. Bloat
$2,760 / 0.7 = $3,943 Gross pay for underwriting purposes
+     $2,800 monthly (not disputed by Lehman)
Total: $6,743


Income for Mrs. Bloat
$3,214 gross monthly per subpoenaed documents
+     $1,900 monthly (not disputed by Lehman)
Total: $5,114

Total gross pay would then be calculated as follows:

Mr. Bloat:      $6,743
Mrs. Bloat:  +  $5,114
Total: $11,857 monthly gross for underwriting purposes.

*See* Black Declaration, ¶17.

Such monthly gross income figures would still produce qualifying ratios under Aurora's limited doc (i.e. Stated Income) program, which allowed for Debt-to-Income (DTI) ratios of 35% for housing debt and 45% for total debt (See Exhibit 1: "Ratios 35.00 / 45.00"):

Housing debt ratio:
$3,645 / $11,857 = 30.74% - QUALIFIES per LBB program guidelines

Total debt ratio:
$5,008 / $11,857 = 42.24%% - QUALIFIES per LBB program guidelines

*See* Black Declaration, ¶18.

Such calculations do not account for the benefit reduction of $2,103/year by NYC for an outstanding loan. (*See* Burcham Declaration, Exhibit A: NYCERS000017). If this income was added back to retirement income as net pay the ratios above would improve even more. If, for instance, such income was added to Mr. Bloats net pay, as was commonly done for underwriting purposes, and a conservative factor of 0.65 was used to gross up income: $2,935 / 0.65 = $4,515 gross, which is nearly identical to the original income shown on the Bloats' loan application. These records were obtained two years after Lehman filed suit, and the documents that Lehman obtained continue to demonstrate that using standard underwriting principles, such income would

still qualify under the LBB guidelines for the LBB limited doc loan program.  *See* Black

Declaration, ¶19.

**ARGUMENT**

Summary judgment is appropriate only when "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED.

R. CIV. P. 56(a).  Moreover, the Court is "obliged to []view the record in the light most

favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving

party's favor." *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 841 (1st Cir. 1993).  In the present

case, Lehman has failed to meet its burden of showing no genuine issue of material fact and its

entitlement to a finding of liability as a matter of law.

> **I.  Lehman Has Not Met Its Burden Of Proving That FNE Is In Breach And Was Required To Repurchase The Bloats' Loans.**

The loan purchase agreements Lehman alleges were breached in this matter incorporate

by reference Aurora's loan guidelines, which contain general boilerplate language stating that the

Seller (in this case FNE) represents and warrants that all loan documents and applications are

true and correct.  Lehman claims that if it is determined that any representations and warranties

are breached, Lehman has the right to demand that the Seller repurchase the loans.  Lehman's

claim that FNE is required to repurchase the Bloats' loans is based solely on the allegation that

the Bloats misrepresented their income in their January and April, 2006 loan applications.  The

loan purchase agreements that Lehman contends were breached state that New York law shall

apply to determine the parties' rights, responsibilities and remedies.

> **A.  Any Alleged Misrepresentation Of Income By The Bloats Was Not A Material Misrepresentation.**

Lehman points to its Seller's Guide in alleging that FNE represented and expressly

warranted that:

14

> No document, report or material furnished to Purchaser in any Mortgage
> Loan File or related to any Mortgage Loan (including, without limitation, the
> Mortgager's application for the Mortgage Loan executed by the Mortgagor),
> was falsified or contains any untrue statement of fact or omits to state a fact
> necessary to make the statements contained therein not misleading.

*See* Baker Decl., Ex. B, Seller's Guide § 703(1), and that:

> The documents, instruments and agreements submitted for loan underwriting were
> not falsified and contain no untrue statement of **material** fact . . . . No fraud was
> committed in connection with the origination of the Mortgage Loan.

(*See* Baker Decl., Ex. B, Seller's Guide § 703(12) (emphasis added)). Read together, these

provisions of the Seller's Guide reflect that any misrepresentation relied on by Lehman to allege

a breach of the representations and warranties contained in the parties' agreement in this case

must be a misrepresentation of a **material** fact. The sole misrepresentation alleged by Lehman is

that the Bloats misrepresented their income, but a borrower's stated income was not a material

element to the underwriting of the Bloats' loans or their subsequent purchase. *See generally*

Declaration of Alan Blocher, submitted herewith.

 As noted above, with regard to such Stated Income loans, the custom and practice in the

mortgage loan industry was that the borrower's unverified income as stated on the borrower's

loan application was not a material factor in the underwriting of such loans. *See* Declaration of

Alan Blocher, ¶ 6. Similarly, the borrower's stated income was not seen in the industry as a

material factor in the corresponding purchase and sale of such Stated Income loans, which were

often purchased by large investment banks and bundled with other loans to be re-sold as

mortgage backed securities. This was particularly true when the purchasing investment bank had

originally underwritten and approved the loan in accordance with its own published underwriting

guidelines for Stated Income loans prior to the loan being funded by and then subsequently

purchased from one of its own correspondent mortgage bankers. *See* Declaration of Alan

Blocher, ¶ 7. As outlined above, the Bloat loans were specifically underwritten and approved by

Aurora in the first place in accordance with Lehman's own published guidelines. Under these circumstances, at the very least genuine issues of material fact exist as to whether Lehman treated the Bloats' income as a material term to the parties' transaction in the first place, which it clearly did not.

Moreover, even using the income figures contained in the documentation obtained in discovery by Lehman does not definitively prove that Aurora's underwriting guidelines would not have been met using standard mortgage underwriting principles. Black Decl., ¶ 17-19. Thus, a genuine question is raised as to whether the difference in income reported by the Bloats on their loan application and what is seen on the documents obtained by Lehman from the Bloats' employers is a material difference such that the loans would not have been approved and/or purchased in any event.

**B.      Any Express Warranty As To The Bloats' Income Was Not Relied On By Lehman As Part Of The Parties' Contract Since Lehman Specifically Set Up Its Stated Income Loan Program In Such A Way Such That Income Was Not To Be Verified.**

In order to prove its claim for breach of contract based upon breach of an express warranty under New York law, Lehman must show that the express warranty was relied on as part of the contract. *See CBS Inc. v. Ziff-Davis Publ'g. Co.*, 553 N.E.2d 997, 1000 (N.Y. 1990). The New York Court of Appeals in *CBS Inc. v. Ziff-Davis Publ'g. Co.* reasoned that "[t]he critical question is not whether the buyer believed in the truth of the warranted information, but whether [he] believed [he] was purchasing the [seller's] promise [as to its truth]." 553 N.E.2d at 1000-001 (quotations omitted). With respect to any warranty as to the Bloats' reported income on their loan application, Lehman cannot show that the alleged misrepresentation of the Bloats income was a material misrepresentation or that it relied upon such a specific representation and express warranty by FNE with respect to the Bloats' income as reasonably being part of the loan

purchase contract since Lehman specifically had instituted its limited doc loan (i.e. Stated Income) program and loan guidelines under which the Bloats' loans were to be made without verification of the borrowers' income. Indeed, Lehman prohibited the income from being verified (Black Decl., ¶¶ 4-6). Thus, in submitting loans for approval under Lehman's stated income loan program, FNE was representing to Lehman that FNE had not verified the borrowers' income, as directed by Lehman. In so doing, FNE was thereby disclosing to Lehman that FNE was not in a position to vouch for the accuracy of the borrower's income. Indeed, these types of stated income loans came to be commonly referred to in the mortgage industry as "liar loans" in that borrowers applying for such loans regularly overstated their incomes since verification of income would not be performed. As the United States Court of Appeals for the Second Circuit has stated interpreting New York law:

> Where a buyer closes on a contract in the full knowledge and acceptance of facts disclosed by the seller which would constitute a breach of warranty under the terms of the contract, the buyer should be foreclosed from later asserting the breach. In that situation, unless the buyer expressly preserves his rights under the warranties . .. , we think the buyer has waived the breach.

*Galli v. Metz ,*973 F.2d 145 (2d Cir. 1992). In the present case, Lehman (1) specifically established a stated income loan program in order to be able to make loans to borrowers at higher interest rates where verification of income was not required or even permitted; and (2) in accordance with that stated income loan program, reviewed and approved the Bloats' loans and then purchased the Bloats' loans from FNE with full knowledge and acceptance of the fact that verification of the Bloats' reported income had not been performed and that borrowers regularly overstated their income on such "liar loans". As Lehman purchased the Bloats' loans with full knowledge and acceptance of these facts and did so without expressly reserving its rights as to an express warranty specifically related to the accuracy of the Bloats' reported income, under New York law Lehman is foreclosed from now asserting a breach of express warranty by FNE as to

the accuracy of the Bloats' reported income on their loan application.  *See e.g. Galli v. Metz*, 973 F.2d 145 (2d Cir. 1992).

As outlined above, Lehman was solely responsible for the lending decision on these loans based on its own underwriting standards for its stated income program.  FNE had no role whatsoever in the lending decision on these loans.  Lehman is in the loan risk business and can take steps to hedge that risk.  Lehman knowingly assumed such risk with the reward of a higher market interest rate for taking on such loans.  Indeed, Lehman was one of the largest, if not the largest purchaser of mortgage loans in the entire industry.  Such is not the business of a small mortgage broker like FNE, which simply acts as the sales arm essentially for large institutional investors such as Lehman.

Once again, given these specific circumstances, at the very least genuine issues of material fact exist as to whether any express warranty as to the Bloats' income was a material representation and warranty relied upon by Lehman as reasonably being part of the parties' contract in the first place, and/or whether Lehman assumed any risk arising from the possibility of income being misreported by prospective borrowers by not having income verified for its stated income loan program.

### C.     Lehman Has Failed To Show There Are No Genuine Issues Of Material Fact As To  Whether It Was Required To Repurchase The Bloats' Loans, And Thus Whether It Has Standing To Assert A Claim For Repurchase Against FNE.

There further exist substantial and genuine issues of material fact as to whether Lehman even has standing to assert a claim for repurchase of the Bloats' loans since it appears that Lehman acted as a volunteer in repurchasing the Bloat loans from the two trusts that previously owned the loans without any showing that Lehman was legally obligated to do so.  It appears that Lehman's subsidiary, Aurora, requested that the loans be repurchased but there is no evidence that any demand was made by the trusts for Lehman to repurchase the loans.  Having acted as a

volunteer in repurchasing the notes, genuine issues of material fact arise as to whether Lehman should be allowed to bring a claim for damages arising out of FNE's alleged breach of contract due to its alleged refusal to repurchase the notes from Lehman. Under these circumstances, summary judgment is not appropriate.

### D. Lehman Has Failed To Prove That No Material Fact Exists As To Whether The Bloats Misrepresented Their Income.

Lehman has failed to meet its burden of showing that no material facts exists as to whether the Bloats misrepresented their income in the first place. The financial statement submitted by the Bloats in March, 2007, almost one year after the loan closed, does not prove that the Bloats misrepresented their income in April, 2006, *See* Black Decl., ¶ 14. Similarly, the documents obtained by Lehman in discovery do not conclusively show that the Bloats misrepresented their income or the full extent of income the Bloats may have been receiving in April, 2006, or preclude the possibility that the Bloats had other income besides that reflected in the subpoenaed documents. *See* Black Decl., ¶ 16-19. Having failed to meet its burden, Lehman's claims for breach of contract are without merit.

### E. The *Young America Mortgage Corp.* case cited by Lehman is inapposite.

Lehman relies on an unpublished case from a California state appellate court, *Young America Mortgage Corp. v. ING Bank, FSB,* No. B219955, 2011 WL 591339 (Cal. Ct. App. Feb. 22, 2011) (unpublished) in support of its motion for summary judgment. First, the *Young America Mortgage Corp.* case is not binding on this court and does not cite New York law. Secondly, it appears that the court in *Young America Mortgage Corp.* was not presented with evidence and argument, and thus did not consider the issue as to how the mortgage industry viewed stated income loans and how in practice the borrower's income was not a material element in the underwriting or purchasing of such loans. Thirdly, it was undisputed in the *Young America Mortgage Corp.* case that the borrower had misrepresented his income and that the

plaintiff had standing to bring the claim for repurchase of the loan. Those issues are in dispute in the present matter. Fourthly, the Court did not consider the question presented here as to whether the plaintiff had assumed the risk of the borrower's income being misreported by not having the income verified under its Stated Income loan program. In the present case significant and genuine issues of material exist as to these important questions, thus precluding the entry of summary judgment on liability.

**II.    Lehman Has Not Proven A Breach Of Contract, And Thus Is Not Entitled To A Finding of Attorneys' Fees.**

Having failed to prove that FNE is in breach of contract, Lehman is not entitled to an award of attorneys' fees.

<u>**CONCLUSION**</u>

Lehman has not met its burden showing that there is no genuine issue of material fact and that Lehman is entitled to finding as a matter of law that FNE breached the parties' agreement to repurchase the Bloats' loans. FNE thus requests that Lehman's motion be denied and that FNE be awarded such other and further relief as the Court deems just and necessary.

Respectfully submitted,

**FIRST NEW ENGLAND MORTGAGE CORPORATION dba ABERDEEN MORTGAGE and FNE MORTGAGE**

By its counsel:

Andrew C. Gately
BBO# 645606
Gately Law Firm, LLC
316 Franklin Street
Newton, MA  02458
Tel. (617) 969-8555
Fax (617) 969-5552
Email:  agately@gately-law.com

CERTIFICATE OF SERVICE

The undersigned hereby certifies that the above and foregoing was served on all counsel of record via the Court's electronic filing system.


**/s/ Andrew C. Gately_____**
Counsel for Defendant