UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 09-11082-GAO

LEHMAN BROTHERS HOLDINGS, INC.,
Plaintiff,

v.

1ST NEW ENGLAND MORTGAGE CORPORATION dba ABERDEEN MORTGAGE AND FNE MORTGAGE,
Defendant.

ORDER
September 12, 2012

O'TOOLE, D.J.

The defendant, 1st New England Mortgage Corp., made two mortgage loans to Roger and Neira Bloat and then sold the loans to Lehman Brothers Bank pursuant to a Loan Purchase Agreement. Lehman Brothers Bank then assigned its rights in those loans to the plaintiff, Lehman Brothers Holdings, Inc. ("Lehman Holdings"). The Bloats defaulted on their loans, and Lehman Holdings, both directly and through its affiliate, Aurora Loan Services, LLC, subsequently requested that 1st New England repurchase the loans in accordance with the repurchase provisions of the Agreement and Aurora's "Seller's Guide," which was incorporated by reference in the Agreement. 1st New England has not repurchased the Bloat loans. Lehman Holdings brought suit against 1st New England for breach of contract and now moves for summary judgment as to liability.

The Seller's Guide provides in relevant part:

> [1st New England] acknowledges that Mortgage Loans are purchased in reliance upon: (i) the truth and accuracy of [1st New England's] representations and warranties set forth in the Loan Purchase Agreement and this Seller's Guide, each of which

> representations and warranties relates to a matter material to such purchase; and (ii) [1st New England's] compliance with each of the agreements, requirements, terms, covenants and conditions set forth in the Loan Purchase Agreement and this Seller's Guide.

(Seller's Guide § 701 (dkt. no. 23-1).) The Seller's Guide later provides:

> [A]s to each Mortgage Loan, [1st New England] represents and warrants as of the related Purchase Date, and covenants that:
>
> 1. Mortgage Loans as Described. No document, report or material furnished to Purchaser in any Mortgage Loan File or related to any Mortgage Loan (including, without limitation, the Mortgagor's application for the Mortgage Loan executed by the Mortgagor), was falsified or contains any untrue statement of fact or omits to state a fact necessary to make the statements contained therein not misleading.
>
> * * *
>
> 12. Validity of Mortgage Documents. . . . The documents, instruments and agreements submitted for loan underwriting were not falsified and contain no untrue statement of material fact or omit to state a material fact required to be stated therein or necessary to make the information and statements therein not misleading.

(Id. § 703.) The Seller's Guide further provides that, in the event of a breach of these representations, warranties, or covenants, 1st New England will indemnify Lehman Holdings for any costs, fees, and expenses resulting from such breaches and will repurchase the related Mortgage Loans.[1] (Id. §§ 710, 711.) To trigger the repurchase provision, the breach must be one

---

[1] Section 710 provides in relevant part: "In the event of a breach of any of the representations, warranties or covenants contained in Section 700 through 710 herein, which breach materially and adversely affects the value of the Mortgage Loans or the interest of Purchaser, or materially and adversely affects the interest of Purchaser in the related Mortgage Loan, and unless Purchaser determines that such breach has been cured, or if a loan becomes an Early Payment Default in accordance with Section 715 herein, Seller shall, at Purchaser's option, repurchase the related Mortgage Loan (in the case of a breach of the representations, warranties or covenants contained in Section 703 hereof or an Early Payment Default), or all Mortgage Loans (in the case of a breach of any of the representations, warranties or covenants contained in Section 702 hereof), at the Repurchase Price. Any such repurchase shall occur no later than thirty (30) days after the earlier of the date on which Purchaser notifies Seller of such breach or the date on

that "materially and adversely affects" the value of the mortgage loans or "the interest of the Purchaser." (Id. § 710.) The Agreement and Seller's Guide both contain choice-of-law provisions providing for the application of New York law.

There is no genuine issue of fact here that the Bloats on their mortgage application misrepresented their total monthly income. They represented that it was $14,400. To reach that figure, Mr. Bloat represented in January and April 2006 that he made $4,500 in gross monthly income from pension payments. (Baker Decl. Ex. G 35, 39 (dkt. no. 23-2).) However, during that period he only made $2,300 in gross monthly income from his pension. (Burcham Decl. Ex. A 16 (dkt. no. 24-1).)[2] The difference between $4,500 and $2,300 is over 15% of the Bloat's represented total monthly income of $14,400.

"The elements of a breach of contract claim under New York law are: (1) the existence of a contract; (2) due performance of the contract by the plaintiff; (3) breach of contract by the defendant; and, (4) damages resulting from the breach." Marks v. N.Y. Univ., 61 F. Supp. 2d 81, 88 (S.D.N.Y. 1999) (internal citations and quotations omitted).

1st New England argues that the Agreement was not breached because the Bloats' untrue statements of fact in their mortgage applications were not "material."[3] In many cases, whether misrepresentations were material might present a disputed question of fact. Here, however, 1st

---

which Seller knows of such breach. Seller must notify Purchaser immediately upon Seller's knowledge of any breach of any representation, warranty or covenant."

[2] 1st New England argues that the custom and practice in the mortgage industry was to "gross up" net income by a factor of 0.7%. (Def.'s Opp'n 12 (dkt. no. 30).) These monthly payments of $2,300, however, already were gross monthly amounts. (See Burcham Decl. Ex. A 16.) In sum, there is no genuine issue of fact that the Bloats' mortgage applications contained untrue statements of fact.

[3] 1st New England also suggests that it did not breach the Agreement because it has not "refused" to repurchase the loans but merely has requested from the plaintiff additional information showing the Bloats actually did misrepresent their income. 1st New England received that additional information, the pension documents, for example, during discovery in this case. Still, 1st New England has refused to repurchase the loans.

New England agreed to stipulate that representations made in Agreement and Seller's Guide were to be considered "material." (Seller's Guide § 701.) One of those representations was that no mortgage loan application contained any untrue statement of fact. (Id. § 703.) The Bloats' mortgage loan applications contained untrue statements of fact. That is, 1st New England acknowledged that untrue statements of fact, such as the income misrepresentations by the Bloats, were material to the parties' transaction.

Similarly, 1st New England argues that the representations in the Agreement and Seller's Guide guaranteeing the truth of the Bloats' statements were not "relied upon" by Lehman. Again, 1st New England acknowledged in the Seller's Guide itself that the mortgage loans were purchased "in reliance upon" the truth and accuracy of 1st New England's representations in the Agreement and Seller's Guide. (Id. § 701.) It is bound by the terms and provisions in the Seller's Guide. (Loan Purchase Agreement § 2 (dkt. no. 23-1).)

By their agreements, the parties were allocating the risk of loss. In effect, 1st New England was giving a kind of money-back guaranty. It was agreeing to repurchase any bad loan that had been made upon misrepresentations in the borrower's application. The Bloats' loans were such loans. By agreeing to stipulate to such matters as materiality and reliance, 1st New England was agreeing to limit the factual considerations that would trigger the repurchase obligation. Falsity of a borrower's representations in applying for the loan would still have to be shown, but once that was shown, 1st New England agreed to stipulate that materiality and reliance also existed. There is nothing illegitimate or even unusual about commercial parties agreeing to such a simple and "bright line" trigger to a repurchase obligation.

Because the parties so clearly addressed and arranged the issue in their contracts, what general industry practices might have been is irrelevant, and proffered testimony from either lay or qualified expert witnesses about that is beside the point. Take it as true that "everyone knew" that so-called stated income loans were risky because borrowers could make representations about their qualifications that would not be verified and thus might turn out to have been exaggerated. That fact would support as much as it would undercut repurchase agreements of the sort reflected in these parties' contracts. A loan purchaser such as Lehman would say to a loan seller such as 1st New England, "Look. We both know these loans have a certain higher risk of default. We'll buy them, but if any loan goes bad and it was made on the basis of a borrower's misrepresentation, you'll buy that loan back." The repurchase provisions were simply an allocation of a well understood risk.

1st New England further argues perfunctorily that Lehman Holdings lacks standing here because it voluntarily purchased the Bloat loans after it already had sold them. Specifically, 1st New England argues that Lehman Holdings bought back in 2008 the loans which it had sold in 2006. (See Def.'s Opp'n 10 (dkt. no. 30).). 1st New England provides no legal support for its assertions and thus has waived its claim. See Harriman v. Hancock Cnty., 627 F.3d 22, 28 (1st Cir. 2010) ("issues adverted to in a perfunctory manner, unaccompanied by . . . developed argumentation, are deemed waived") (citations omitted). It appears that Lehman Holdings may have repurchased the loans because it had an obligation to do so, similar to the obligation it seeks to enforce against 1st New England. (See Morrow Decl. Ex. A ¶¶ 39-42 (dkt. no. 41-1); Supplemental Baker Decl. ¶¶ 7-8 & Exs. 6-7 (dkt. no. 43).) In any event, the Agreement's provisions, including the repurchase provisions, are enforceable not only by the original parties to the Agreement but also by successors and assigns. (Loan Purchase Agreement § 4.) Lehman

5

Holdings, current holder of the Bloat loans, has standing to enforce 1st New England's promise to repurchase.

There is no genuinely disputed issue of fact material to the question whether Lehman Holdings can enforce the repurchase agreement or whether the conditions for forcing repurchase exist. Accordingly, Lehman Holdings is entitled to summary judgment as to liability on its complaint. There is also no genuine dispute that under the relevant agreements, Lehman Holdings is entitled to its attorneys fees and associated costs.

Lehman Holding's Motion for Summary Judgment on Liability (dkt. no. 21) is GRANTED.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.
United States District Court