UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| LEHMAN BROTHERS HOLDINGS INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | **Civil Action No. 09-cv-11082-GAO** |
| FIRST NEW ENGLAND MORTGAGE CORPORATION dba ABERDEEN MORTGAGE and FNE MORTGAGE, | ) ) ) ) ) | |
| Defendants. | ) ) | |

# FIRST NEW ENGLAND MORTGAGE CORPORATION'S
## <u>MOTION FOR RECONSIDERATION</u>

Defendant First New England Mortgage Corporation ("FNE")[1] requests pursuant to Fed. R. Civ. P. 59(e) that this Court reconsider its Order dated September 12, 2012 ("Order"), which granted summary judgment in favor of Plaintiff Lehman Brothers Holdings, Inc. ("Lehman Holdings") as to FNE's liability for breach of contract, including the requirement that FNE repurchase the Bloats' loans, and for Lehman Holdings' attorneys fees and associated costs. As grounds for this motion, FNE respectfully states that this Court did not properly interpret the Seller's Guide under New York law, and, therefore, its Order was legally incorrect. There were two manifest errors in the Court's interpretation of the Seller's Guide.

First, the Court failed to appreciate that one of the "Representations, Warranties and Covenants of Seller" set forth in the Seller's Guide that FNE was alleged to have breached–Section 703(12) – requires that the "documents … submitted for loan underwriting … contain no untrue statement of *material* fact …." (emphasis supplied). The term "material" in that provision

---
[1] FNE's official corporate name is "1st New England Mortgage Corporation."

has meaning and must be given effect under New York law. Lehman Holdings did not present undisputed facts that the Bloats' allegedly misstated income was a material fact in Lehman Brothers Bank's (i.e., Lehman Holdings' assignor's) decision to purchase the Bloats' loan from FNE. For this reason alone, the Court should not have granted summary judgment in favor of Lehman Holdings. FNE is entitled to a trial on this issue of whether the misstatement of income was a material fact.

Second, the Court held that "there is no genuinely disputed issue of fact material to the question whether Lehman Holdings can enforce the repurchase agreement." (See Order at 6.) Respectfully, this holding was a manifest error because the Court failed to apprehend that the Repurchase Obligation in the Seller's Guide contains language clearly establishing that only certain specified breaches of the representations, warranties or covenants in the Seller's Guide would require FNE to repurchase the Bloats' loans. The terms of the Repurchase Obligation are set forth in Section 710 of the Seller's Guide. Section 710 expressly provides that the Repurchase Obligation is triggered only if a breach "materially and adversely affects the value of the Mortgage Loans or the interest of Purchaser [Lehman Brothers Bank, its successors and/or assigns], or materially and adversely affects the interest of Purchaser in the related Mortgage Loan." Section 710 also implies that FNE be provided an opportunity to cure in the event of any default. Lehman Holdings did not present facts, much less undisputed facts, or even offer any argument that FNE's submission of documents containing allegedly misstated income of the Bloats "materially and adversely affect[ed] the value of" the Bloats' loans, "materially and adversely affect[ed] the interest of Purchaser," or "materially and adversely affect[ed] the interest of Purchaser in the" Bloats' loans. Nor did Lehman Holdings prove, through undisputed facts, that it provided FNE an opportunity to cure any default. For these additional reasons, the

Court should not have granted summary judgment to Lehman Holdings as to liability for breach of the repurchase provision. FNE is entitled to a trial on these issues as well.

## FACTUAL BACKGROUND

FNE relies upon and incorporates the facts set forth in FNE's Memorandum in Opposition to Plaintiff's Motion for Summary Judgment on Liability; the Declarations of Bradley T. Black (of April 9, 2012, and August 22, 2012), Alan J. Blocher (of April 9, 2012, and August 21, 2012), and Andrew C. Gately, Esq. and the exhibits collectively thereto; and FNE's Local Rule 56.1 Statement. Specifically relevant facts will be discussed in context of the arguments below.

## ARGUMENT

**A.** **Standard for reconsideration**

This Court has "'substantial discretion and broad authority to grant or deny' a motion for reconsideration made pursuant to Fed. R. Civ. P. 59(e)." Provanzano v. Parker View Farm, Inc., 827 F. Supp. 2d 53, 57 (D. Mass. 2011) (quoting Ruiz Rivera v. Pfizer Pharm., LLC, 521 F.3d 76, 81 (1st Cir. 2008)). In exercising that discretion, the Court must balance "the need for finality of judgments with the need to render a just decision." Venegas–Hernandez v. Sonolux Records, 370 F.3d 183, 1490 (1st Cir. 2004). "A motion for reconsideration will be allowed if the movant shows a manifest error of law, newly discovered evidence or that the Court has made an error 'not of reasoning but of apprehension.'" Provanzano, 827 F. Supp. 2d at 57 (quoting Ruiz Rivera, 521 F.3d at 81).

**B.     FNE did not breach the contract because the Seller's Guide requires that a misstatement of income be "material," and Lehman Holdings failed to present undisputed facts that the misstatement of the Bloats' income was "material."**

In the Order, the Court held that FNE breached the representations and warranties set forth in the Seller's Guide by selling the Bloats' loans to Lehman Brothers Bank when the "Bloats on their mortgage application misrepresented their total monthly income." (Order at 3.) The Court correctly acknowledged that, "[i]n many cases, whether misrepresentations were material might present a disputed question of fact." (Id.) However, the Court concluded that FNE "agreed to stipulate that representations made in the Agreement and Seller's Guide were to be considered 'material.'" (Order at 4 (citing Seller's Guide § 701).) The Court further concluded that "[o]ne of those representations [that FNE stipulated were to be considered "material"] was that no mortgage loan application contained any untrue statement of fact." (Id. (citing Seller's Guide § 703).) The Court thus concluded based on the language of certain portions of the Seller's Guide alone, and without considering whether there were disputed factual issues concerning the materiality (or lack thereof) of the Bloats' allegedly misstated income, that FNE was liable for breach of contract strictly because the Bloats allegedly misstated their income in their loan application.

The Court's analysis, respectfully, was incorrect as a matter of law. Section 703 purports to contain various representations, warranties and covenants by Seller (here, FNE) to Purchaser (here, Lehman Brothers Bank, its successors and/or assigns). Two of the representations, warranties and covenants – Sections 703(1) and 703(12) – contain ambiguous, even inconsistent, provisions when read together. Thus, in Section 703(12), FNE purportedly promised in pertinent part that the "documents … submitted for loan underwriting … contain *no untrue statement of material fact*…." (Declaration of John Baker ("Baker Decl.") Ex. B § 703(12) (emphasis

4

added).) At the same time, in Section 703(1), FNE purportedly represented that "[n]o document, report or material furnished to Purchaser in any Mortgage Loan File or related to any Mortgage Loan (including, without limitation, the Mortgagor's application for the Mortgage Loan executed by the Mortgagor), … contains *any untrue statement of fact*…." (Id. § 703(1) (emphasis added).) These provisions, as applied to the circumstances of the Bloats' loan application, are inconsistent. One provision, Section 703(12), warrants there are no untrue statements of "material fact" in the documents submitted for loan underwriting, while the other provision, Section 703(1), states there are simply no untrue statements of fact in the Mortgage Loan File. By pleading breach of both Sections 703(1) and 703(12), Lehman Holdings acknowledges, and there is no dispute, that the documents submitted by the Bloats containing the alleged misstated income are among the documents in the Mortgage Loan File and those submitted for loan underwriting.

The language in Section 703(12) – that there shall be no untrue statements "of material fact" – is significant and must be given meaning and effect under New York law. "It is well settled that a contract must be read as a whole to give effect and meaning to every term.…" RLI Ins. Co. v. Smiedala, 947 N.Y.S.2d 850, 853 (N.Y. App. Div. 2012) (citing New York State Thruway Auth. v. KTA-Tator Eng'g Services, P.C., 913 N.Y.S.2d 438, 440 (N.Y. App. Div. 2010)). See also Hudson Valley Properties & Rentals, Inc. v. Ursuline Provincialate, E. Province of the U.S., Inc., 633 N.Y.S.2d 592, 594 (N.Y. App. Div. 1995) (contract should not be "so interpreted as to render its terms meaningless"). In its Order, the Court acknowledged that Section 703(12) expressly states that the Seller was representing there were no untrue statements "of material fact," but the Court failed to give that term meaning and concluded that FNE

"agreed to stipulate that representations made in the Agreement and Seller's Guide were to be considered 'material.'" (See Order at 2-4 (citing Seller's Guide § 701).)

The Court's interpretation of the Seller's Guide renders the phrase "of material fact" in Section 703(12) a nullity, which violates well-established rules of contract interpretation. Under New York law, "it is a well-established principle of contract interpretation that specific provisions concerning an issue are controlling over general provisions." Huen New York, Inc. v. Bd. of Educ. Clinton Cent. Sch. Dist., 890 N.Y.S.2d 748, 749 (N.Y. App. Div. 2009); Isaacs v. Westchester Wood Works, Inc., 718 N.Y.S.2d 338, 339 (N.Y. App. Div. 2000) ("[T]he *ejusdem generis* principle of contract interpretation . . . gives precedence to the specific clause . . . rather than the general clause."). Section 703(12) includes the more specific requirement that there be no untrue statements of "material" fact, whereas Section 703(1) is silent as to "materiality." Thus, the less specific language of Section 703(1) must yield to the more specific language of Section 703(12).

Another standard of contract interpretation – *contra proferentem* – also requires that Section 703(12) be read in favor of FNE because Lehman Holdings' assignor, Lehman Brothers Bank, drafted the standard-form loan-purchase agreement, including the Seller's Guide. (Declaration of Bradley T. Black of Apr. 9, 2012 ("Black Decl."), ¶ 3.) This is settled law in New York. See SSP Capital Partners, LLC v. Mandala, LLC, 715 F. Supp. 2d 443, 452 (S.D.N.Y. 2009), *aff'd sub nom.* SSP Capital Partners, LLP v. Mandala, LLC, 402 F. App'x 572 (2d Cir. 2010) (loan agreement had to be "construe[d] against lender, as drafter"); Roberts v. Cobblestone Homes of Rochester, Inc., 737 N.Y.S.2d 455, 456 (N.Y. 2002) (ambiguous Assignment of Proceeds and Security Agreement had to be construed against drafter); Colonial Pac. Leasing Corp. v. Brown, 28 Misc. 3d 1214(A), *6 (N.Y. Sup. Ct. 2010) ("any ambiguity is

construed against the drafter, in this case, Colonial Pacific, as the successor-in-interest to Citi, the presumed drafter of the Credit Agreement as the lender"). As a federal district court in New York reasoned in a case involving a loan agreement, to construe an ambiguity in a loan agreement against the lender "is both reasonable and proper" as the lender "is in the business of making loans and drafting form agreements." See SPS Capital, 715 F. Supp. 2d at 452. It is especially appropriate "because these provisions in particular were drafted for [the lender's] benefit." Id. This principle applies to the Seller's Guide, especially Sections 701, 703 and 710, which were drafted by Lehman Brothers Bank for its benefit and those of its successors and assigns. (Black Decl. ¶ 3.) It is not for the Court to redraft those provisions in Lehman Holdings' favor now. See SPS Capital, 715 F. Supp. 2d at 452 ("That [the lender] apparently could not draft these or other provisions … with greater clarity … does not mean that this Court should redraft those provisions in [the lender's] favor.").

Based on this principle, contracts of adhesion also are construed against the drafting party. See Flagg v. Yonkers Sav. & Loan Ass'n, FA, 307 F. Supp. 2d 565, 582 (S.D.N.Y. 2004), *aff'd*, 396 F.3d 178 (2d Cir. 2005) ("Residential mortgage agreements … are preprinted form contracts of adhesion that are offered by lenders on a 'take it or leave' it basis that deprives prospective borrowers the opportunity to negotiate terms effectively.... Accordingly, we will interpret the terms of the agreement in accordance with the standards applicable to contracts of adhesion, and construe it against defendant [the drafter] in case of 'doubt or ambiguity.'"); 55 Eckford Realty LLC v. Bank of E. Asia (U.S.A.) N.A., 929 N.Y.S.2d 199, *9 (N.Y. Sup. Ct. 2011) ("The Commitment letter was unilaterally drafted by defendant, to be 'accepted' by plaintiffs. As such, it was a contract of adhesion to be construed against the drafter."); Wells Fargo v. Tyson, 897 N.Y.S.2d 610, 615 (N.Y. Sup. Ct. 2010), *judgment rev'd on other grounds,*

7

*appeal dismissed*, 917 N.Y.S.2d 914 (N.Y. 2011) ("Since the mortgage at issue is an instrument promulgated by the lender to the borrower and since the operative and binding terms thereof are not negotiable by the borrower, such an instrument is considered to be a contract of adhesion which is typically construed against the drafter thereof.").

The Seller's Guide is a contract of adhesion offered by Lehman Holdings on a "take it or leave it" basis. (Black Decl. ¶ 3.) Lehman Holdings did not allow negotiation, and, as a result, there was no negotiation. (Id.) Any inconsistency between Section 703(12) and either Section 703(1) or Section 701, therefore, must be reconciled in favor of FNE. Accordingly, pursuant to Section 703(12), FNE only represented that there would be no untrue statement "of material fact" in the Bloats' loan application. Lehman Holdings, however, failed to present undisputed facts that the Bloats' misstatement of their income was "material."

Having overlooked the requirement contained in Section 703(12) that any untrue statement made by the Bloats be one of "material fact" in order for there to be a breach of representations and warranties in the first place, the Court incorrectly refused to consider the evidence submitted by FNE concerning materiality (or lack thereof) and to determine, as required in connection with a motion for summary judgment, whether there are genuine issues of material fact requiring a trial on Lehman Holdings' breach of contract claim. The Court acknowledged that, "[i]n many cases, whether misrepresentations were material might present a disputed question of fact," but reasoned that FNE agreed under Section 701 of the Seller's Guide "to stipulate to such matters and reliance" thereby "agreeing to limit the factual considerations," and, therefore, concluded that "what general industry practices might have been is irrelevant, and proffered testimony from either lay or qualified expert witnesses about that is beside the point." (Order at 3, 4, 5.) But, respectfully, the Court's analysis put the cart before the horse: Section

8

703(12) requires a factual determination that the Bloats' stated income was a "material fact" *before* FNE ever could be considered to have stipulated under Section 701 that Lehman Brothers Bank, in purchasing the Bloats' loans, relied upon the "truth and accuracy of" FNE's representation that the documents submitted for the Bloats' loan underwriting "contain[ed] no untrue statement of material fact" or that this purported representation by FNE "relates to a matter material to" Lehman Brothers Bank's purchase of the Bloats' loans.

Accordingly, the Court should have considered FNE's evidence and arguments that the Bloats' stated income was not a "material fact" in Lehman Brothers Bank's decision to purchase the Bloats' loans. (See generally Mem. in Opp'n to Pl.'s Mot. for Summary J. on Liability.) These facts and arguments are described at length in FNE's original opposition to Lehman Holdings' motion for summary judgment, and, therefore, FNE will not repeat them here except to summarize and say that genuine disputed issues exist concerning whether the Bloats' income was a material fact given that the Bloats' loans were "stated income" loans, and the Aurora Loan Services, Inc. (a Lehman affiliate) loan program at issue did not require FNE to verify the Bloats' income. (See id. at 2-6, 14-16.) For the very first time in connection with its reply memorandum, Lehman Holdings submitted an "expert" opinion that "for stated income loans, such as the Bloats [*sic*] Loans, the stated income … is material information for underwriting and approving the stated income loan and for the subsequent purchaser of the stated income loan."

(Declaration of J.F. ("Chip") Morrow ("Morrow Decl.") ¶ 46).[2] But this opinion is disputed by the opinion of FNE's expert, Mr. Blocher (see generally Declaration of Alan J. Blocher of Apr. 9, 2012) and by the simple fact, admitted by Lehman Holdings, that income was not required to be verified under the "stated income" loan program at issue (Deposition of Lehman Holdings' Designee John R. Baker, III, 48:17-19 ("I know that the product guidelines for a stated income loan say that income verification is not required."), attached as Ex. 1 to the Declaration of Andrew C. Gately, Esq.).[3] As a matter of common sense, if Lehman Brothers Bank (through its affiliate) deemed the Bloats' income so unimportant under its "stated income" program that it did not require FNE to verify it, how could the Bloats' income have been a "material fact" in either the underwriting process or Lehman Brothers Bank's decision to purchase the Bloats' loans? FNE is entitled to have the record viewed in the light most favorable to it and to have all reasonable inference drawn in its favor at this stage. LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993). Simply put, Lehman Holdings has not carried its burden of showing that there are no genuine factual disputes concerning whether the Bloats' income was a "material fact" under Section 703 of the Seller's Guide, and summary judgment was, therefore,

---

[2] Mr. Morrow also agrees with Mr. Baker that the "stated income on the Uniform Residential Loan Application is material to the decision to purchase and sell any stated income loan for an entity like LBB or LBHI as misstatement of income can result in (a) having to repurchase the loan for the misstatement, (b) a greater likelihood of loan default, and (c) upon repurchase any resale or recovery of the loan will be at less than face value." (Morrow Decl. ¶ 51; see also Baker Decl. ¶ 10.) But these conclusory statements are far too abstract and speculative to constitute evidence, let alone conclusive evidence, that the Bloats' income was a material fact in the decision to purchase the Bloats' loans. See In re Al-Suleiman, 461 B.R. 893, 896 (Bankr. M.D. Fla. 2011) ("The moving party has the burden of establishing the right to summary judgment. Conclusory allegations by either party, without specific supporting facts, have no probative value."); Rushing v. Flerlage Marine Co., 3:08CV-531-JDM, 2010 WL 3620166, at *2 (W.D. Ky. Sept. 8, 2010) ("The party bearing the burden of proof on a particular issue—regardless of whether he is the movant or non-movant—cannot rely on mere allegations or conclusory statements in support of his position, however.").

[3] Indeed, FNE Vice President Bradley T. Black has offered sworn testimony that "FNE had been advised by Aurora on numerous occasions that FNE was prohibited from verifying income in order for loans to be considered for the limited doc or stated income program." (Black Decl. of Apr. 9, 2012, ¶ 6.) Lehman Holdings has moved to strike this statement as hearsay, but it is the statement of a party opponent (Aurora is a Lehman corporate affiliate and Lehman Holdings' predecessor-in-interest) and, therefore, non-hearsay under Fed. R. Evid. 801(d)(2).

inappropriate. FNE is entitled to a trial on the question whether the misstatement of the Bloats' income was a "material" fact.

**C.      The Court erred in ruling that Lehman Holdings can enforce the Repurchase Obligation contained in the Seller's Guide because Lehman Holdings failed to present undisputed facts that any misstatement of the Bloats' income "materially and adversely" affected Lehman Holdings' interest, and enforcing the Repurchase Obligation would be an inequitable forfeiture.**

The Court also held that "[t]here is no genuinely disputed issue of fact material to the question whether Lehman Holdings can enforce the repurchase agreement or whether the conditions for forcing repurchase exist." (Order at 6.) This holding was erroneous for three reasons. *First*, it was based upon the Court's failure to apprehend that the Repurchase Obligation set forth at Section 710 of the Seller's Guide limits FNE's duty to repurchase to breaches that Lehman Holdings proves had a material and adverse effect. *Second*, it overlooked the cure provision contained in Section 710, which Lehman Holdings did not satisfy. *Third*, the repurchase obligation is tantamount to a forfeiture, which, under New York law, equity should intervene to prevent, particularly where, as here, any breach was immaterial.

   *1. The Court's decision overlooked explicit language limiting the Repurchase Obligation to breaches causing a material and adverse effect.*

The Repurchase Obligation set forth at Section 710 of the Seller's Guide limits FNE's duty to repurchase to breaches that Lehman Holdings proves had a material and adverse effect. Lehman Holdings, however, offered this Court no argument, much less undisputed facts, establishing any material and adverse effect caused by FNE's alleged breach arising out of the Bloats' allegedly misstated income. Accordingly, the Court's entry of summary judgment as to this issue was improper.

The relevant portion of Section 710, the Repurchase Obligation is as follows:

> In the event of a breach of any of the representations, warranties or covenants contained in Section 700 through 710 herein, *which breach materially and adversely affects the value of the Mortgage loans or the interest of Purchaser, or materially and adversely affects the interest of Purchaser in the related Mortgage Loan*, and unless Purchaser determines that such breach has been cured, … Seller shall, at Purchaser's option, repurchase the related Mortgage Loan (in the case of a breach of the representations, warranties or covenants contained in Section 703 hereof or an Early Payment Default) … at the Repurchase Price. Any such repurchase shall occur no later than thirty (30) days after the earlier of the date on which Purchaser notifies Seller of such breach or the date on which Seller knows of such breach. Seller must notify Purchaser immediately upon Seller's knowledge of any breach of any representation, warranty or covenant.

(Baker Decl. Ex. B § 710 (emphasis added).) Accordingly, and as the Court correctly observed, "[t]o trigger the repurchase provision, the breach must be one that 'materially and adversely affects' the value of the mortgage loans or 'the interest of the Purchaser.'" (Order at 3 (quoting Seller's Guide § 710).) By contrast, in Section 701 of the Seller's Guide, FNE as Seller merely:

> acknowledge[d] that Mortgage Loans are purchased in reliance upon: (i) the truth and accuracy of Seller's representations and warranties set forth in the Loan Purchase Agreement and this Seller's Guide, each of which representations and warranties relates to a matter *material to such purchase*….

(Baker Decl. Ex. B § 701 (emphasis added).) Therefore, FNE *did not* acknowledge in Section 701 that a breach of the representations and warranties would be deemed to *"materially and adversely affect" the value of the Bloats' loans or "the interest of Purchaser."*

The Court's analysis concerning FNE's repurchase obligation incorrectly conflated Sections 701 and 710. As noted above, the Court initially recognized that "[t]o trigger the repurchase provision, the breach must be one that 'materially and adversely affects' the value of the mortgage loans or 'the interest of the Purchaser.'" (Order at 3 (quoting Seller's Guide § 710).) But then the Court went on to rely exclusively on what it considered to be the stipulation as to materiality contained in Section 701 and ignored the particular requirements triggering repurchase contained in Section 710:

12

> By their agreements, the parties were allocating the risk of loss. In effect, 1st New England was giving a kind of money-back guaranty. *It was agreeing to repurchase **any** bad loan that had been made upon misrepresentations in the borrower's application.* The Bloats' loans were such loans. *By agreeing to stipulate to such matters as materiality and reliance, 1st New England was agreeing to limit the factual considerations that would trigger the repurchase obligation.* Falsity of a borrower's representations in applying for the loan would still have to be shown, but once that was shown, 1st New England agreed to stipulate that materiality and reliance also existed. There is nothing illegitimate or even unusual about commercial parties *agreeing to such a simple and 'bright line' trigger to a repurchase obligation*.

(Order at 4.) The Court thus completely read the requirement previously acknowledged – "[t]o trigger the repurchase provision, the breach must be one that 'materially and adversely affects' the value of the mortgage loans or 'the interest of the Purchaser'" (Order at 3 (quoting Seller's Guide § 710)) – out of the Repurchase Obligation and held that the Repurchase Obligation was satisfied simply by proof of a breach with nothing more. The Court's conflation of Sections 701 and 710, and failure to give effect to the language in Section 710 requiring Lehman Holdings to prove a material and adverse effect in order to trigger repurchase, was a manifest error under New York law. See RLI Ins. Co., 947 N.Y.S.2d at 853 ("It is well settled that a contract must be read as a whole to give effect and meaning to every term.…") (citing New York State Thruway Auth., 913 N.Y.S.2d at 440). See also Hudson Valley Properties & Rentals, Inc., 633 N.Y.S.2d at 594 (contract should not be "so interpreted as to render its terms meaningless").

To be entitled to summary judgment for breach of Section 710, Lehman Holdings was required to present undisputed facts demonstrating that FNE's alleged breach of Sections 703(1) and/or 703(12) "materially and adversely affect[ed] the value of the Mortgage loans or the interest of Purchaser, or materially and adversely affect[ed] the interest of Purchaser in the related Mortgage Loan," but Lehman Holdings did not do so. In fact, Lehman Holdings *completely ignored* this specific showing it was required to make to prove FNE's breach of, or obligation under, Section 710 and went so far as to omit the pertinent language and replace it

13

with an ellipsis in both its opening and reply memoranda in support of its motion for summary judgment. (See Pl. Lehman Brothers Holdings Inc.'s Mem. of Law in Support of Its Mot. for Summary J. on Liability at 4-5; Pl. Lehman Brothers Holdings Inc.'s Reply in Support of Its Mot. for Summary J. on Liability at 3.) Only Lehman Holdings can explain why it chose to excerpt Section 710 misleadingly to read as though FNE's repurchase obligation was triggered simply by a breach of a representation or warranty. But having chosen to ignore it, Lehman Holdings failed entirely to argue or present undisputed facts demonstrating a material and adverse effect caused by FNE's alleged breach arising from the Bloats' allegedly misstated income.

Indeed, the record before the Court contains facts demonstrating that Lehman Holdings *did not* suffer any material and adverse effect *caused by* FNE's alleged breach of Section 703(1) or 703(12), i.e., submission of documents containing false statements concerning the Bloats' income. *First*, correspondence from the Bloats produced by Lehman Holdings showed that the Bloats' inability to pay their mortgage resulted from serious health problems suffered by Mrs. Bloat and an interruption in Mr. Bloat's pension payments. (Black Decl. Ex. 4.) These issues post-dated and were completely independent of any misstatement of income, and this evidence supports the inference that these later issues were the cause of any material and adverse effect upon the value of the Bloats' loans or Lehman's interest therein. (See id.) *Second*, Lehman Holdings cannot claim any material and adverse effect *caused by* FNE's alleged submission of documents containing false statements concerning the Bloats' income because, again, the Bloats' loans were "stated income" loans known (or, at minimum, highly likely) to contain inaccuracies and under which a borrower's stated income was not a material factor in underwriting or subsequent purchase or sale. FNE discussed the limitations inherent in the Lehman "stated loan"

program at length in its opening memorandum and will not repeat them here. FNE incorporates those arguments by reference and points the Court in particular to the Declarations of Bradley T. Black and Alan J. Blocher. In sum, given this factual record, in addition to Lehman Holdings' utter failure even to argue it met the required showing under Section 710, Lehman Holdings failed to carry its burden as the moving party to demonstrate the absence of disputed facts as to liability (or obligation) under Section 710. The Court's entry of summary judgment, therefore, was incorrect.

>    2. *The Repurchase Obligation required Lehman Holdings to provide FNE with a <u>meaningful opportunity to cure any breach of the representations and warranties</u>.*

The Court's holding as to FNE's obligation under Section 710 to repurchase the Bloats' loans also was incorrect because the Court failed to give effect to the cure provision contained in Section 710. As quoted more fully above, Section 710 contains an exception to the repurchase obligation when "Purchaser determines that such breach [of a representation, warranty or covenant] has been cured." (Baker Decl. Ex. B § 710.) Section 710 further states that "Seller must notify Purchaser immediately upon Seller's knowledge of any breach of any representation, warranty or covenant." (Id.) These provisions required Lehman Holdings (or its predecessor) to provide FNE with a <u>*meaningful*</u> opportunity to "cure" or remedy the problem created by FNE's alleged breach (i.e., the submission of documents allegedly misstating the Bloats' income). The opportunity to cure would have included a <u>*timely and clear statement*</u> that FNE was expected to repurchase the Bloats' loans and relieve Purchaser of its potential exposure as mortgagee. If this meaningful opportunity to cure had been provided in a timely fashion, in early 2007 when the Bloats apparently went into default on their loans, and before the real-estate market collapsed, FNE could have repurchased the Bloats' property and resold it at or near the value of the loans.

15

Lehman Holdings and its predecessors did not, however, provide FNE a meaningful opportunity to cure under Section 710. Instead, on June 6, 2007, Aurora sent a letter to FNE asserting the Bloats had misstated their income on their loan application. (See Black Decl. Ex. 3.) In the June 6, 2007 letter, apparently recognizing that the Seller's Guide required FNE to be provided an opportunity to cure, Aurora offered FNE "to pursue alternatives to repurchase, *including a cure of defect within a reasonable period of time*, indemnification of Lehman, or repricing of the loan." (Id.) Aurora went on: "We ask that you review the loan along with our findings to determine whether you can cure the above-referenced defect or provide evidence to refute our findings. If you are unable to cure the defect or cannot provide sufficient evidence to refute our findings within 30 days, Lehman will require that you fulfill your obligations … and repurchase the loan." (Id.) Aurora's findings, however, and basis for asserting at the time that the Bloats had misstated their income, relied not on contemporaneous documentation but rather a subsequent financial statement from February 2007 showing that, at that later time, the Bloats had a combined income lower than what was stated in the loan applications. (See id.)

FNE Vice President Bradley T. Black responded to Aurora's June 6, 2007 letter, and correctly pointed out as a matter of simple logic that the fact that the Bloats disclosed lower income on the 2007 financial statement did not establish that the Bloats had misstated their income on earlier loan applications. (See Black Decl. Ex. 5.) Mr. Black asked for additional documentation supporting the alleged misrepresentation and an opportunity "to work together with [Aurora] to make sure there is not any unresolved issue with the Bloat loan." (Id.) Aurora replied by email on July 20, 2007, stating that it was reviewing Mr. Black's letter response and would contact him the following week with its "findings" (Black Decl. Ex. B), but FNE never

16

heard back from Aurora or Lehman until two years later, in 2009, when they filed suit. Black Decl. ¶ 12.

Based on this history of communications, Lehman itself recognized that the Seller's Guide required that FNE be provided with an opportunity to cure. But Lehman then unilaterally ceased communication with FNE and thus left the impression that the matter had been resolved on its end. Lehman did not provide a timely and meaningful opportunity for FNE to cure at a time, including an unequivocal demand to repurchase, when FNE could have secured the collateral and foreclosed on the Bloats' property. Rather, Lehman allowed the Bloats' default to linger and essentially did nothing while the real-estate market collapsed. Lehman presented no evidence in support of their motion for summary judgment that they provided FNE with a timely and meaningful opportunity to cure as required by Section 710. Accordingly, it was an error for the Court to hold that FNE now is obligated to repurchase the Bloats' loans.

> 3. *Requiring FNE to repurchase the Bloats' loans is tantamount to forfeiture, which equity should step in to prevent as a matter of New York law.*

Finally, the Court's decision holding that the Repurchase Obligation contained in the Seller's Guide is enforceable against FNE overlooked the settled principle of New York law that "equity will not enforce forfeitures" and, therefore, an immaterial breach will not support a breach of contract claim resulting in that which is tantamount to forfeiture. See C-Suzanne Beauty Salon, Ltd. v. General Ins. Co. of America, 574 F.2d 106, 110 (2d Cir. 1978) (appeals court affirmed trial court's refusal to dismiss insurance claim based on insured's initial refusal to cooperate because insured did belatedly cooperate with insurer's investigation and insurer did not show prejudice); Steingart v. 21 Associates, Inc., 31 Misc. 2d 212, 217 (N.Y. Sup. Court 1961) ("equity would not permit a forfeiture of [party's] contract rights on the technical grounds here asserted"). In Hirsch v. Lindor Realty Corp., the New York Court of Appeals held that late

17

payments on a mortgage loan did not support the lender's claim, despite a provision in the mortgage agreement that time was "of essence" on one of the late payments. In support of its holding, the Court of Appeals stated that "equity may properly intervene to prevent a forfeiture of a substantial interest despite a technical breach or omission by the holder of the interest," and the lender had not shown any harm as a result of the late payments. 63 N.Y.2d 878, 880, 472 N.E.2d 1024, 1025 (1984) (internal quote and citation omitted).

Similarly, here, the alleged misstatement of income by the Bloats (which FNE was unaware of) was not material for the reasons discussed above, and Lehman Holdings has not presented undisputed facts proving otherwise. It would constitute an inequitable forfeiture and penalty if Lehman Holdings were permitted to rescind its purchase of the Bloats' loans and to force FNE to pay its attorneys' fees, without any demonstration of harm that the Bloats' alleged misstatement of income caused. The record reflects that, after the Bloats received financing, they informed Aurora that they were unable to meet the loan payment obligations because of a medical crisis involving Mrs. Bloat and an interruption in Mr. Bloat's pension payments. (Black Decl. Ex. 4.) These issues post-dated and were completely independent of any misstatement of income, and this evidence supports the inference that these later issues were the cause of any material and adverse effect upon the value of the Bloats' loans or Lehman's interest therein. (See id.) Based on this record, Lehman Holdings has not, and cannot, demonstrate through undisputed facts that the Bloats' misstatement of income prevented them from meeting their payment obligations. Accordingly, it would be inequitable to force FNE to repurchase the loan based on what appears to be a meaningless and immaterial misstatement of fact in the Bloats' loan documents.

## CONCLUSION

For all of the reasons set forth above, Defendant First New England Mortgage Corporation respectfully requests that the Court reconsider its Order granting summary judgment as to liability in favor of Lehman Brothers Holdings Inc.

## REQUEST FOR ORAL ARGUMENT

In accordance with Local Rule 7.1(D), Defendant First New England Mortgage Corporation hereby respectfully requests oral argument on this Motion for Reconsideration.

> Respectfully submitted,
> FIRST NEW ENGLAND MORTGAGE
> CORPORATION dba ABERDEEN
> MORTGAGE and FNE MORTGAGE,
> By its attorneys,
>
> /s/ Nicholas B. Carter
> Nicholas B. Carter (BBO# 561147)
> Kimberly E. Dean (BBO# 658593)
> TODD & WELD LLP
> 28 State Street, 31st floor
> Boston, MA  02109
> Tel. (617) 720-2626
> Fax. (617) 227-5777
> Email:  ncarter@toddweld.cm

Dated:  October 10, 2012

## LOCAL RULE 7.1 CERTIFICATE

In accordance with Local Rule 7.1(A)(2), I hereby certify that counsel for both parties conferred on October 9, 2012, by telephone in a good-faith attempt to resolve or narrow the issues raised in this motion, but were unable to do so.

> /s/ Nicholas B. Carter
> Nicholas B. Carter

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on October 10, 2012.

> /s/ Nicholas B. Carter
> Nicholas B. Carter